JUSTICE NELSON
delivered the Opinion of the Court.
This is an appeal from a Fourth Judicial District Court, Missoula County, jury verdict finding Donald Barrack, guilty of aggravated assault, and from the accompanying judgment filed on August 21, 1992. We affirm.
The following are issues on appeal:
I. Did the District Court err in treating Barrack’s motion for a new trial as a petition for post-conviction relief under a writ of coram nobis?
II. Did the District Court err when it denied Barrack’s motion for a new trial based upon insufficient evidence to support the jury verdict?
III. Did the District Court err when it denied Barrack’s motion for a new trial based upon his “excusable mistake” in failing to subpoena hospital records containing the victim’s blood alcohol content?
*156 FACTUAL BACKGROUND
The defendant/appellant, Donald Barrack (Barrack), was living in a trailer at 4625 Graham, Westview Trailer Court in Missoula, Montana, with Robert Cole (Cole), whom Barrack worked with at the Mahlum Ace Hardware Store in Missoula. Robert Cole owned the trailer with his wife, Joan Cole (Joan), from whom he had separated in August of 1991. Joan and Cole decided to sell the trailer during January and February of 1992, and they were able to find a buyer. The buyer wanted to move into the trailer within a week of closing.
This was a problem because Barrack was still living in the trailer. Cole also still lived there “on and off’ but he spent a great deal of time at the home of Sue Llewellyn (Sue), who was his fiancee. At the time of the sale of the trailer, he was in the process of moving into her home.
Joan and Cole met with Barrack on February 13, 1992, to inform him that the trailer had been sold and he would have to vacate the trailer in a very short time. Cole and Barrack “finally worked it out,” ending their negotiations with a signed note stating that Barrack would vacate the trailer around February 20. They then went to two taverns in town, spent about two hours together and drank a few beers. Barrack left the second tavern, Mulligan’s, but Cole stayed with another friend and continued drinking.
At some point later in the evening, Cole and his friend, Marty, went to a tavern in Marty’s neighborhood. A fight started at the neighborhood tavern, the police were called to end, the altercation, and they took Cole and Marty to Marty’s house because the two men were not able to drive. When Cole arrived at Marty’s house, he called Sue to come and get him. Sue arrived at Marty’s house, retrieved Cole and as they were driving to Sue’s house, they started to discuss whether Barrack had left the trailer. Sue wanted to make sure that Barrack was either packing or had moved out so she drove to the trailer.
Testimony after that point in time is contradictory. Cole testified that when they arrived at the trailer, they went to the front door, knocked loudly, heard no answer, went to the back door, knocked, heard no answer, and tried the front door one more time. The two went to the car, discussed the issue for a while, Cole tired of the discussion, and he walked away. Cole also testified that while the two were going from door to door, they were yelling, screaming and making loud noises. He further testified that the porch light and a *157 yard light were on, as well as a light under the hood of the stove in the kitchen.
Cole stated that when he walked away, Sue got back in the car, pulled out of the driveway, stopped and pulled back into the driveway. He decided to return to the car, walked back to where it was parked and as he came around the car, he saw Barrack standing near the car, holding a gun and Sue laying by the car.
Sue testified that she was taking care of Cole and Joan’s child on the evening of February 13, 1992, because Cole was out celebrating his friend, Marty’s birthday. She stated that he called her from Marty’s house later in the evening for a ride and they discussed the situation with Barrack and the trailer as she was driving. She testified that they drove to the trailer, both walked to the front door, knocked hard, received no answer, went to the back door to knock, and then returned to the front door. She testified that she was yelling at Cole at the time and there were outside lights on but none inside as far as she could see. After they received no response, the two walked back to the car, continued to fight and then Cole started to walk away.
Sue got in the car in an attempt to follow him, changed her mind, turned the car off, and went back to the front door. The door was locked so she kicked the door as hard as she could. On the third try, she kicked the door open, took a step inside the door, then she saw a flash, and felt a bullet enter her chest.
Mike Davenport, a trailer park neighbor, testified that at about 10:15 or 10:20 on the evening in question, he heard a loud banging and noise. He went to his door and looked outside in the direction of the pounding. He saw a woman hollering, screaming and pounding on the door. He said he could not see any lights on at the house nor was there a light on the porch. He stated that he could just see one person, a woman, pounding on the door and yelling. She could not get inside so she returned to the car, and tried to get the person in the car to help her get into the trailer. She had a fight with the person in the car until the other person left and started walking down the street. Davenport then saw the woman get into the driver’s side of the car, start the engine, start to leave, pause and return to the trailer. At that point, he went to get dressed, and while he was returning to where he had been watching the events of the night, he heard a loud, high-pitched crack. He testified that when he got to the door, he looked out and saw the woman walking, leaning over a bit, to the rear of her car. She was looking up the street toward where the person *158 who left the car had walked and ultimately, she collapsed. At that point, Mike Davenport called 911 and reported the incident.
Barrack testified that he discussed the move from the trailer on February 13, 1992, with Cole and Joan. After Joan left, Cole and Barrack came to an agreement that Barrack would move to another place within a week. At a later point in time, the two men went to a tavern called Joker’s Wild for a few beers. The two then met with Cole’s friend, Marty, to celebrate Marty’s birthday and the three drank beer at a tavern called Mulligan’s. Barrack left that tavern after drinking 1 1/2 beers, ordered some takeout food from a restaurant, went home, ate, watched television and went to sleep. He stated that he went to bed around 8:30 to 9:00.
Barrack further testified that he had been asleep for some time when he thought he heard knocking at the back door, “more of a feeling of something striking the trailer than I had heard, but I thought I heard a knock,” and he went to the back door. He further reported that he did not put on his glasses because he was not sure that he had heard or felt something, he thought perhaps it was a gust of wind rocking the trailer. He did not hear anything at the back door so he returned toward the bedroom and as he was proceeding, he heard a loud crash which physically rocked the trailer.
He stated that he grabbed his pistol because of the violence of the repeated crashing that followed. He went to the front of the trailer, still listening to the banging, which was “exceedingly violent and rapid.” He asked, ‘Who is it?” and received no response. He repeated his question, then stated, “[d]on’t kick the door in, I’m armed.” Barrack heard kicking at the door, the door flew open, he backed up, saw a large human form, unidentifiable, rush through the door and then he recalls the “muzzle flash when the gun went off.”
PROCEDURAL BACKGROUND
On February 21, 1992, a deputy county attorney of Missoula County filed an affidavit and motion for leave to file an information on Donald Barrack, charging him with committing the offense of aggravated assault, a felony, pursuant to § 45-5-202(1), MCA. The motion was granted on that same day and on March 4,1992, Barrack was arraigned and pled “not guilty.” Trial in the matter commenced on June 29, 1992, and a jury found Barrack guilty of the offense of aggravated assault on June 30,1992.
On August 5,1992, Barrack’s motion for a new trial was heard and sentence was pronounced against him. He was sentenced to Montana *159 State Prison for 10 years, with all but two years suspended. The final judgment of the court was filed on August 21, 1992, confirming Barrack’s sentence of 10 years in prison with all but two years suspended. Later that same day, the District Court filed an order amending the judgment, suspending the entire prison term under certain conditions.
Barrack filed a written motion for a new trial on August 26,1992. Ahearing on the motion for a new trial was held on December 16, and on December 17, 1992, an opinion and order was filed, stating that at an October 14, 1992, post trial hearing, “the Court informed the parties that it [would] treat the Defendant’s Motion for New Trial as a Petition for Post Conviction Relief under a Writ of Coram Nobis pursuant to § 46-21-101(1), MCA.” The District Court denied the motion for a new trial (petition for post-conviction relief) on the issues of the sufficiency of the evidence and the alleged failure of the State to provide medical reports on the victim’s blood alcohol content at the time of the incident. Barrack appealed to this Court on January 5, 1993.
STANDARD OF REVIEW
The standard of review for denial of post-conviction relief is whether substantial evidence will support the findings and conclusions of the district court. Walker v. State (1993), 261 Mont. 1, 6, 862 P.2d 1, 4.
I. POST-CONVICTION RELIEF
Barrack makes two arguments regarding his motion for a new trial — 1) there was insufficient evidence to support the jury’s verdict and 2) the State’s alleged failure to provide Barrack with the test results of the victim’s blood alcohol content on the night of the incident. However, before deciding those issues, we take this opportunity to clarify the District Corut’s treatment of Barrack’s motion for a new trial as a petition for post-conviction relief. In its opinion and order, dated December 17,1992, the District Court stated that it would treat the motion for a new trial as a petition for post-conviction relief under a writ of coram nobis, pursuant to § 46-21-101(1), MCA.
However, a writ of coram nobis is no longer available as a remedy for post-conviction relief. Section 46-21-101(1), MCA, provides as follows:
When validity of sentence may be challenged. (1) A person adjudged guilty of an offense in a court of record who has no *160 adequate remedy of appeal and who claims that a sentence was imposed in violation of the constitution or the laws of this state or the constitution of the United States, that the court was without jurisdiction to impose the sentence, that a suspended or deferred sentence was improperly revoked, or that the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack upon any ground of alleged error available under a writ of habeas corpus, writ of coram nobis, or other common law or statutory remedy may petition the court that imposed the sentence or the supreme court to vacate, set aside, or correct the sentence or revocation order.
“The post-conviction hearing statutes are an attempt by the legislature to consolidate all of the common-law statutory remedies normally available to challenge a sentence.” In re McNair (1980), 189 Mont. 321, 323, 615 P.2d 916, 917. While the Constitution of Montana (Art. II, Sec. 19) and Title 46, Chapter 22, Parts 1 through 3 of the Montana Code Annotated, provide for separate habeas corpus proceedings, Montana law does not provide for a separate writ of coram nobis.
The State argues that Barrack’s motion for a new trial was untimely, should have been denied, and that it was improper to treat the motion as a petition for post-conviction relief. Barrack was found guilty of aggravated assault on June 30,1992. According to § 46-16-702(2), MCA, a motion for a new trial must be in writing and filed by the defendant within 30 days following a finding of guilty. The State points out Barrack’s written motion for a new trial was not filed until August 26, 1992. Therefore, Barrack’s motion for a new trial was untimely because it was not filed within 30 days of the verdict and for this reason, the State contends, Barrack’s motion should have been summarily denied.
Barrack’s motion for a new trial was indeed, untimely. However, under Rule 5, M.R. App. P, he could have filed an appeal within 60 days of the judgment. The judgment in the instant case was filed on August 21, 1992; the last day for Barrack to appeal his case would have been October 21, 1992. However, at a post-trial hearing on October 14, the District Court informed Barrack that it would treat his motion for a new trial as a petition for post-conviction relief. At this point in time, Barrack still could have appealed his case. However, the District Court’s decision to treat the motion as a petition for post-conviction relief may have effectively curtailed any attempt *161 Barrack may have made to appeal within the remaining statutory time limit.
Even though Barrack was possibly lulled into inaction as far as appealing during the statutory time limit, he must still be allowed an opportunity to seek review of his case before this Court. In Fitzpatrick v. State (1983), 206 Mont. 205, 210-211, 671 P.2d 1, 4, in discussing § 46-21-101, MCA, the post-conviction relief statute, we stated that:
“The first element of the test which a petitioner must satisfy is that petitioner be “adjudged guilty of an offense in a court of record who has no adequate remedy of appeal...” This phrase does not mean that a petitioner may avail him or herself of the appellate review process, and, when the results are unfavorable, utilize the post-conviction review procedure to, in effect, file numerous and successive “appeals.” The language of the statute for part one of the test clearly intends this form of relief to be available to convicted persons who have not had their sentences reviewed by the appellate court. It is clearly an abuse of the relief procedure to withhold issues which could and should have properly been raised on appeal....”
In the instant case, Barrack did not have an opportunity to avail himself of the appellate review process because of the District Court’s treatment of his untimely motion for new trial as a petition for post-conviction relief. He effectively did not have an opportunity to properly raise issues on appeal. Moreover,
[a]buse of process occurs where an applicant raises in post-conviction proceedings a factual or legal contention which the petitioner deliberately or inexcusably failed to raise in the proceedings leading to conviction, or having raised the contention in the court, failed to pursue the matter on appeal.
McKenzie v. Osborne (1981), 195 Mont. 26, 34, 640 P.2d 368, 373. Barrack did not deliberately or inexcusably fail to pursue the matter on appeal because he was unintentionally misled by the District Court, thereby failing to appeal within the proper time period. The abuse of the post-conviction relief process is not a concern in this case because there is no evidence that Barrack intentionally failed to appeal or failed to exercise due diligence in seeking review of the legal issues raised.
The District Court erred in treating Barrack’s untimely motion for a new trial as a petition for post-conviction relief under § 46-21-101(1), MCA, and as a writ of coram nobis. Nevertheless, because the District Court possibly lulled the defendant into a position where he *162 did not timely pursue his appeal rights, we will affirm the District Court’s decision to rule on the merits' of Barrack’s untimely motion for new trial.
In doing so we wish to emphasize, however, that our decision here is not in any way to be read as enlarging the scope of post-conviction relief or as diminishing a defendant’s obligation to timely file a motion for a new trial and a petition for post-conviction relief or appeal in accordance with the applicable statutes. The circumstances of this case are unique.
II. INSUFFICIENCY OF THE EVIDENCE
“The standard of review of the sufficiency of the evidence is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” State v. Bower (1992), 254 Mont. 1, 6, 833 P.2d 1106, 1110.
Barrack argues that there was insufficient evidence to support the jury’s verdict of guilty of aggravated assault. He contends that:
Ms. Llewellyn’s appearance and demeanor on the witness stand were very sympathetic. No hint emerged of her intoxicated and irrational rage on the night in question. The defense believes that Mr. Barrack was convicted because the jury’s emotions were inflamed by the idea of a former law enforcement officer shooting a woman they perceived as someone he should have recognized under any circumstance.
Finally, Barrack claims that he was the victim, not the aggressor, and that he was acting in self-defense. At trial, he pled the affirmative defense of justifiable use of force. Although Barrack argues there was insufficient evidence to support his conviction,
[t]he fact that the defendant’s testimony conflicted with that of the State’s witnesses does not, by itself, render the evidence insufficient to support his conviction. The weight of the evidence and the credibility of the witnesses are exclusively within the province of the trier of fact; when the evidence conflicts, the trier of fact determines which shall prevail.
Bower, 833 P.2d at 1111. Moreover, in determining whether the use of force was justified, “[t]he mere fact that defendant testified to a self-defense claim does not entitle him to an acquittal;” the trier of fact must weigh the testimony and decide whether Barrack acted with the belief that the use of force was necessary and his belief was reasonable. Bower, 833 P.2d at 1111. In essence, the jury must *163 determine whether the defendant was justified in his use of force when Sue entered the trailer on the evening in question.
In the instant case, the jury weighed the evidence, assessed the credibility of the witnesses and determined that the State’s witnesses were more credible. They determined that Barrack was not justified in his use of force against Sue Llewellyn and that he was guilty of aggravated assault. As stated above, the fact that the defendant’s testimony conflicts with the State’s witnesses does not render the evidence insufficient to support a conviction. Here, the jury’s verdict is sufficiently supported by the evidence.
There was testimony that there was adequate lighting for a person inside the trailer to see anyone outside knocking on the doors. Both Sue and Cole testified that Barrack knew Sue well enough to recognize her if he saw her. Moreover, there was testimony that there was enough noise, with the knocking and other sounds being made, that a person inside the house would have heard that there were people outside the trailer. Sue testified that Barrack did not ask “[w]ho are you?” nor did she hear anyone say “I’m armed, [d]on’t come in here,” or warn her at all when she was entering the trailer. She testified that she did not feel that there was anyone in the trailer at the time she entered.
“The [trier of fact] is not bound to blindly accept defendant’s version of the facts. It is free to pick and choose the evidence it wishes to believe.” Bower, 833 P.2d at 1111, citing State v. Sorenson (1980), 190 Mont. 155, 170, 619 P.2d 1185, 1194. Here, the jury chose to believe the State and, as stated above, there is sufficient evidence to support the jury’s verdict. The District Court did not err in denying Barrack post-conviction relief based on his claim that there was insufficient evidence to support the jury’s verdict.
III. BLOOD ALCOHOL REPORT
Barrack argues that defense counsel was relying on a longstanding course of conduct with the State when it failed to subpoena records of Sue’s blood alcohol content for use during the trial. He asserts that his error in failing to discover her blood test is excusable because in the past, the State routinely provided law enforcement reports, including blood test results, upon request by the defense attorneys. Barrack’s attorney had requested results from the State and the Sheriff’s Office but did not receive them so he was led to believe that there were no test results. The attorney did not realize *164 there were blood test results until he subpoenaed them on August 4, 1992, in preparation for sentencing.
The State contends that Barrack wanted the State to conduct his own discovery for him. It also states that it did not subpoena the blood alcohol records at any time nor did it use any information regarding the blood alcohol content of the victim at trial.
A hearing was held on the issue of the blood alcohol results on December 16, 1992, in which defense counsel testified that he had asked Lt. Brannin and Mr. Van Valkenburg, a deputy county attorney, for blood alcohol reports. Counsel stated that Lt. Brannin told him he did not think that there was a blood alcohol test because she was a Jehovah’s Witness. Further, counsel stated that although available from St. Patrick’s Hospital, he did not receive a copy of the blood alcohol results until he subpoenaed them for sentencing purposes. He argued at the hearing that if he had known that he was not going to get them through the sheriff’s office, he would have gotten them on his own, but he was led to believe that none existed because he had never had a “problem in getting anything from the sheriff’s department or county attorney’s office in the past, and I think it was just a mistake that they missed it....”
When Brannin testified, he stated that he remembered that the fact that Sue was a Jehovah’s Witness was a factor in the case, but that he did not remember any specific request for blood alcohol results. Brannin also testified that he never received a blood alcohol test for Sue, although Brannin did know she had been drinking that evening because she did acknowledge the fact during a police interview. Moreover, Brannin had prepared a memorandum to the deputy county attorney stating that “there was certainly no specific request for this information,” referring to the blood alcohol results.
The Deputy County Attorney stated at the hearing that when the defense attorney interviewed Sue, she did tell counsel that she had had “either two or three glasses of wine mixed with 7-Up, or something of that nature, prior to the incident that night.” Moreover, the county attorney asserted, she also told Brannin that she had been drinking when she made her statement to the police officer and that statement was made available to the defense but defense counsel never cross-examined Sue on that issue at trial.
The District Court, in its order of December 17, 1992, stated the following:
Hearing on Defendant’s petition was had on December 16,1992 with defense counsel testifying that he asked State’s counsel for *165 blood alcohol results on the victim and was referred to the sheriff’s office. Defense counsel further testified that the investigative officer in the Sheriff’s office said he did not think there was one because the victim was a Jehovah’s witness. The officer testified at hearing that he does not recall the conversation and that his files do not contain blood alcohol results for the victim. Defense counsel subpoenaed the hospital records following trial for sentencing purposes and those records contained blood alcohol results of the victim.
The Court would grant Defendant a new trial if the State had exculpatory evidence in its possession which was not available to Defendant and did not turn over the evidence to defense counsel. However, it does not appear the State had the blood alcohol results on the victim in its possession. The hospital records were equally available to both parties by subpoena and therefore the evidence is not newly discovered evidence which was unavailable for trial and a new trial is not warranted in this case.
We agree with the District Court that it does not appear that the State had blood alcohol results on Sue in its possession. Moreover, the hospital records were available to both parties by subpoena. Defense counsel had information that she had been drinking and if counsel thought that jury knowledge of her drinking may have changed the outcome of the trial, it was counsel's responsibility to request the information from the sheriff’s office or county attorney’s office in a formal manner if informal requests were of no avail. A written request for the necessary information addressed to the county attorney’s office or a request to the District Court for an order requesting that the information be made available to the defendant could have been employed to obtain the blood alcohol results, pursuant to § 46-15-322, MCA.
The problem of the prosecution failing to reveal evidence necessary for a defendant’s case is not present here. Lt. Brannin stated that they did not have any reports on Sue’s blood alcohol level on the night of the incident and never requested such reports. “Police officers may not frustrate or hamper a defendant’s right to obtain exculpatory evidence but they have no affirmative duty to gather such evidence absent express statutory mandate.” State, City of Bozeman v. Heth (1988), 230 Mont. 268, 272, 750 P.2d 103, 105. We recently clarified the State’s obligation of disclosure under § 46-15-322, MCA, in State v. Licht (1994), [266 Mont. 123], 879 P.2d 670, 673. While, as we *166 pointed out in that case, subsections (l)(a) through (d) and subsections (2)(a) through (c) of that statute require the prosecution to disclose all material and information described, whether inculpatory or exculpatory, and while subsection (l)(e) requires disclosure of all exculpatory or mitigating material or information, there is no obligation under the statute for the State to disclose material or information which it does not have in its possession. Here, neither the prosecution nor the police had the blood alcohol results and they had no affirmative duty to obtain them. Therefore, the District Court did not err when it denied the motion for a new trial (petition for post-conviction relief) based on Barrack’s argument that his failure to discover Sue’s blood test results was an excusable mistake.
AFFIRMED.
CHIEF JUSTICE TURNAGE, JUSTICES GRAY and WEBER concur.