No. 97-097

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 11

STATE OF MONTANA,

Plaintiff and Appellant,

v.

JAMES G. BRUMMER,

Defendant and Respondent.

APPEAL FROM:     District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Robert S. Keller, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Scott A. Albers, Chief Public Defender, Cascade County, Great Falls,
Montana

For Respondent:

Brant S. Light, Cascade County Attorney, Julie Macek, Jeffrey D. Mora,
Dirk            M. Sandefur, Deputy County Attorneys, Great Falls, Montana

Submitted on Briefs: July 23, 1997

Decided:    January 22, 1998
Filed:

_____
Clerk

Justice William E. Hunt, Sr., delivered the Opinion of the Court.

¶1     Defendant-Respondent James G. Brummer (Brummer) was charged by information
with Sexual Intercourse Without Consent, Aggravated Kidnapping, and Assault.  A jury
trial was held in the Eighth Judicial District Court, Cascade County, in which Brummer
was acquitted of the offenses charged, but found guilty of Kidnapping, a lesser included
offense of Aggravated Kidnaping.  After the jury's verdict, but before entering judgment,

the District Court, on its own initiative, notified the parties of its intent to order a new trial. Although neither party had made a motion for a new trial, the District Court conducted a hearing on the matter, and ordered a new trial sua sponte. The State of Montana (State) appeals that order. We affirm.

¶2    We address the following issues on appeal:

¶3    1. Did the District Court have authority under § 46-16-702, MCA, to grant a new trial sua sponte?

¶4    2. If so, did the District Court abuse its discretion in ordering a new trial in the interest of justice?

BACKGROUND

The Alleged Offenses

¶5    Most of the facts of this case are disputed. Tina Music (Music) and Jamie McKnight (McKnight) are two long-time friends who lived together with their boyfriends in Great Falls, Montana. On November 27, 1995, Music, McKnight, and two male friends, who were not their boyfriends, went out for an evening of socializing. After visiting other bars, the four ended up at Spoon's Saloon for more drinks and a game of pool. At Spoon's, McKnight recognized Brummer, who was a prior acquaintance of both McKnight and Music. McKnight knew Brummer as her boyfriendþs former employer, and Music knew Brummer as the owner of the CasCo building, where she had previously rented a wedding chapel. The CasCo building, formerly the Columbus Hospital, had been remodeled into apartment housing, a small convenience store, a restaurant, and a chapel used for weddings and reunions.

¶6    At Spoon's, Brummer was playing video keno and winning a substantial amount of money when McKnight approached him. During their conversation which lasted several minutes, McKnight reintroduced Music to Brummer, and asked him if he wanted to "party." Brummer testified that upon McKnightþs introduction, Music stated, "This is my woman, but I want a man tonight," and that Music and McKnight kissed. Music and McKnight denied making this statement and denied kissing each other.

¶7    Brummer testified that both McKnight and Music knew about his substantial winnings while he was playing keno. He testified that while the women were standing next to him at the keno machine, either McKnight, or Music, or both, made comments similar to "Why can't we ever win like that?" He also testified that McKnight said, "You're going to screw around and lose it all. Check it out." However, McKnight testified that although she stood next to Brummer during their conversation, she was unaware of his substantial winnings. Similarly, Music testified that she was not aware of Brummer's winnings until later when Brummer cashed out his ticket and she heard the bartender exclaim,"We have a big winner." Music testified that she knew Brummer was the winner, but did not know how much money he had won.

¶8    In response to McKnight's question regarding a party, Brummer indicated that he would like to party and invited both McKnight and Music to his living quarters in the CasCo building. Brummer asked McKnight whether she and Music had a ride to which they replied that they did. The two male friends that had accompanied the women were waiting for them outside in the car, apparently unaware of what they were doing. McKnight and Music then went into the bathroom and discussed whether they should go with Brummer. When the women came out of the bathroom, they discovered that their

male friends had left the bar without them. The women then asked Brummer for a ride and he agreed. Brummer cashed out his keno ticket for $940.00 and the three left the bar at 2:00 a.m. headed for the CasCo building.

¶9     On the way to the CasCo building, McKnight, Music, and Brummer spoke about Brummer's marital problems. Brummer testified that the conversation also included the topic of sex. He testified that McKnight stated, "What do you think of my friend? What do you think of Tina? Isn't she exciting? Everybody in town wants her." Brummer also testified that both women represented to him that there were no men in their lives. McKnight and Music denied making these statements.

¶10     Once the three arrived at the CasCo building, Brummer showed the women to a room he was using as a bedroom on the second floor. The door to the room had no handle or knob, so Brummer used a screwdriver to open it. McKnight and Music testified that when the door was shut, it was "locked," and that the screwdriver was required to unlock the door. However, Brummer testified that the door was never locked. Brummer stated that although the door was missing a knob or handle, one could open the door by lifting a little latch within the mechanism. Although Brummer used a screwdriver to lift the latch, he testified that a person could also use his finger.

¶11     Once in the bedroom, McKnight told Brummer she wanted a drink. Brummer led the two women to a closet in the chapel where he stored liquor. McKnight chose what she wanted and the three returned to the bedroom. Then McKnight wanted soda to drink with the liquor. Brummer had a key to the small convenience store located on the first floor of the building. McKnight testified that Brummer gave her and Music the key and that they went down to the store by themselves, took some beverages and vitamins, and returned to the bedroom upstairs. However, Brummer testified that he accompanied the women to the store, unlocked the door, allowed them to get some beverages, and paid for the beverages with store credit. The women chose seven cans of 7-Up and two containers of orange juice totaling $4.70. Brummer testified that on his credit slip, he subtracted the cost of the beverages from his balance of $22.40, and indicated a new balance of $17.20. At trial, Brummer produced the credit slip showing this written computation and the date of the night in question. Brummer also testified that on the way to the store, the two women engaged in a kiss intended to be provocative, but described by Brummer as "disgusting." Brummer testified that after getting the beverages, he accompanied the women back to his room.

¶12     At the room, Brummer fixed McKnight a drink and asked the women if they wanted to get high. They replied yes and Brummer gave them cocaine to snort. The women also took cocaine orally. Brummer took cocaine via self-injection. McKnight put one of the lines of Cocaine in a small cellophane to take home, but did not tell Brummer about it.

¶13     The bathroom was located a few feet down the hall from Brummer's bedroom. McKnight testified that she went to the bathroom twice with Music and once or twice alone. The first time McKnight and Music went to the bathroom, Brummer opened the door for them with the screwdriver. McKnight told Brummer she was uncomfortable having the door "locked." McKnight testified that thereafter, Brummer left the door open, and she could come and go freely. Brummer's testimony on this point corroborates that of McKnight. However, Music testified that Brummer did not leave the door open, because on McKnight's third time to the bathroom, Brummer "unlocked" the door for her to go, but told Music she had to wait until McKnight's return before he would let her go.

¶14    McKnight testified that when she and Music returned from their second bathroom break, Brummer, fully clothed, began rubbing against her legs and chest.  She stated that she told him to stop and left for the bathroom again.  McKnight stated that upon returning from the bathroom, Brummer resumed rubbing against her and tried to force her head down into his lap.  McKnight stated that she pushed him away and told him she had to visit the bathroom.  She testified that she opened the door herself, and that instead of going to the bathroom, she left the building.  When asked why she left the building, McKnight stated that she felt uncomfortable with Brummer's advances, and had seen the butt of a gun near the bed.  McKnight testified that throughout this ordeal, until she left the room, Brummer left Music alone.  She also testified that Brummer was clothed while she was in the room.

¶15    For the most part, Music's testimony corroborated that of McKnight, but there exist some significant discrepancies.  Contrary to McKnight, Music testified that Brummer was wearing only his underwear and socks when he began fondling McKnight.  Also contrary to McKnight, Music stated that when McKnight left the room for the last time under the pretense of going to the bathroom, she did not let herself out.  Rather, Brummer opened the door for her.

¶16    Brummerþs account of what transpired in the room differs significantly from that of the two women.  He testified that when the women returned from the bathroom, they began to "entertain" him.  Specifically, he stated that the women engaged in a "strip-tease" dance whereby Music danced while McKnight removed Music's clothing.  Brummer testified that during this dance, McKnight said, "What do you think of my friend?  Isn't she beautiful?" and "You're going to have to take care of us."  Brummer testified that he then asked, "What are you talking about?  A couple hundred dollars?  If that's what you are talking about, no problem," to which McKnight replied that money was what she was talking about.

¶17    Brummer testified that Music eventually wore only her blue panties, and that both she and McKnight began disrobing him.  Brummer stated that he and Music then began dancing and necking when he noticed McKnight sitting on the heater right next to his pants.  Brummer stated that he "knew what [McKnight] was trying to do," so he picked up his pants, and put them in the corner close to the bed.  He then asked Music whether McKnight would leave them alone.   Brummer testified that he and Music resumed necking and were about to engage in sexual intercourse when McKnight began to give him oral sex.  He testified that she did this several times, and that each time, he and Music told her to stop.  Brummer testified that then McKnight told them to turn around on the bed.  Once turned around, Brummer's  pants were farthest from his head.  Brummer testified that McKnight began to engage in oral sex again, but that the next thing he knew she was gone, and he saw that his pants had been moved.  Brummer testified that when McKnight was performing oral sex, she reached around to his pants and stole his keys and money, including the $940.00 in keno winnings.

¶18    McKnight testified that once she left the room, she waited outside for Music to join her.  Five to ten minutes went by and Music did not show, so McKnight went and called a cab.  The cab took McKnight to her male friendþs house, located one block away from the Sheriff's office, where she retrieved her purse, keys, and truck.  McKnight drove home and discovered a message on her answering machine from Brummer.  When McKnight discovered that Music had not yet come home, she called 9-1-1.  McKnight admitted that she passed up three opportunities to call 9-1-1 before arriving home.

¶19    Music testified that upon discovering McKnight's absence, Brummer became angry and cursed McKnight.  Music stated that Brummer locked her in the room while he

attempted to track down McKnight. Music testified that when Brummer returned shortly thereafter, he grabbed her by the arm, took her into the hallway, and locked her in a closet. Music began pounding on the door. Music stated that after five minutes, Brummer returned, opened the door, put the side of a gun next to her head and told her to be quiet. Music testified that Brummer locked her in the closet again, but that Brummer eventually returned and took Music to the basement boiler room. Music testified that then Brummer pushed her to the filthy, dusty ground and raped her. Music stated that Brummer then took her back to a room on the second floor, injected cocaine, and raped her again. Music testified that she begged him to let her go. She stated that finally he let her go, and she ran home. At trial, Music produced white panties and jeans she allegedly wore on the night in question. However, Music could not explain to the cross-examiner why her clothing was not filthy, or dusty, like the floor where she was allegedly raped.

¶20    Again, Brummer testified to a different turn of events. He agreed that upon discovering McKnight's absence and his pants laying on the floor, he immediately went to go look for McKnight on foot. However, he testified that when he left, he was in a hurry and left the door wide open. Brummer stated that he was gone for about fifteen minutes and that Music could have left the room at any time. Brummer was unsuccessful in locating McKnight.

¶21    When Brummer returned to the CasCo building, he discussed with Music the stolen money and keys. Brummer testified that Music told him she believed McKnight would steal his keys, but not his money. Music told Brummer that McKnight had several times before stolen keys from people with the intent to rob them later. Brummer testified he then asked Music for McKnight's address and telephone number, but that Music refused to give him the information. Brummer stated he then walked Music to the elevator and told her he was going to call the police. Brummer testified that Music, fearful of being charged with a narcotics violation, said, "I'll do anything. But don't call the police." Brummer testified that Music eventually gave him the information, and offered to go and get his keys and money from McKnight if he would lend her his van. Brummer refused. Again, Music said she would do anything if he did not involve the police. Brummer testified that Music then agreed to go into a closet and wait while he attempted to locate McKnight by car.

¶22    Brummer testified he drove to McKnight's house, but saw no tire tracks or footprints in the snow around the house. He then drove back to the CasCo building. At the CasCo building, Brummer went to the closet, heard Music pounding on the door, and let her out. Brummer testified that at that point, "It was over . . . I was exhausted." He stated that Music was relieved he had decided not to involve the police. Brummer testified that he told Music to pick up McKnight's coat and cigarettes and that he would drive her home.

¶23    Brummer stated that on their way out of the building, he decided to go down to the boiler room. Brummer testified it was his practice to conserve energy by turning down the heat on weekends when his commercial tenants did not do business. Thus, Brummer stated, he wanted to go down to the boiler room to make sure the boiler had water in it and the timer was set correctly for Monday morning. Brummer testified that Music accompanied him to the basement, kissed him affectionately, and told him that she was romantically interested in him. Brummer stated that he began to have romantic feelings for Music too. Brummer testified that Music was scared to be alone in the basement and wanted to go with him to the boiler room. Brummer testified that despite his warnings that the boiler room was filthy and dangerous, Music insisted on going. Brummer took Music with him to the boiler room. He testified that aside from checking the boiler and the timer, and showing Music the incinerator, nothing else happened in the

boiler room.

¶24     Upon returning from the boiler room, Brummer made a phone call to McKnight and  left a message on the answering machine, stating that he wanted his money back. Brummer testified that he and Music then went to the bathroom, and then into a small room with a bed and twice engaged in consensual sexual intercourse.  Brummer testified that there was an old, clipless gun laying on the window sill of the bathroom, but that he told Music it did not work.  Brummer stated he never picked up the gun, and never threatened Music with the gun.

¶25     Brummer testified that after having sex with Music, he drove her home in his van. Officers Stimac and Thatcher testified that when they responded to the CasCo building, they saw Music and Brummer walking with a normal expression, no sign of trouble between them, no disheveled clothing, and no sign of fright.  Brummer testified that on the way to Music's home, he and Music talked about going on a cruise together someday. Brummer testified that Music told him she was tired of the guys she had been dating and was  romantically interested in him.  Brummer testified that Music requested to be dropped off a block from her home, and that when he did so, she kissed him and told him sheþd have his money and keys to him the next day.  Nothing happened the next day. Brummer testified that he called McKnight twice and asked for his money back, to which she allegedly  responded, "Brummer, this is a two-way street . . . You raped that girl. And you're in big trouble."

                              The Trial

¶26     On November 28, 1995, Brummer was charged by information with Sexual Intercourse Without Consent, Aggravated Kidnapping, and Assault, all of which are felony offenses.  Brummer pleaded not guilty to all three charges and a jury trial was set for October 22-31, 1996.  During pre-trial preparations, the District Court ordered the State and Brummer to submit jury instructions in accordance with the court's standard "10-7-4 time line."  Under this time line, the State was required to serve its proposed jury instructions ten days before trial, Brummer was required to serve his proposed instructions seven days before trial, and any rebuttal was to be made four days before trial.  At this time, the court also ordered that absent a showing of good cause for failing to provide an instruction prior to trial, no instruction would be given which was not presented prior to trial.

¶27     On October 11, 1996, in compliance with the 10-7-4 time line, the State submitted its 29 proposed jury instructions for the three offenses charged.  The State did not include any instructions for lesser included offenses.  Given the Stateþs omission of lesser included offense instructions, and the court's firm order regarding instructions, Brummer assumed the State was proceeding on an "all-or-nothing" strategy.  Likewise,  Brummer adopted the same all-or-nothing strategy for his defense, and, as a result, did not offer a lesser included offense instruction.

¶28     At trial, after the close of the evidence, the court held an informal, off-the-record conference to discuss the proposed instructions.  At that time, the State offered an instruction on Kidnapping, a lesser included offense of Aggravated Kidnapping.  Brummer objected on the ground that the lesser included instruction was without good cause and improper under the court's pre-trial order.  The next day, the court held a formal, on-the-record instruction settlement conference.  Again, the State offered the lesser included offense instruction and  Brummer objected on several grounds, one of which included that he would be prejudiced by such a late request.  Brummer argued that having shown no good cause for failing to offer the lesser included instruction at the pre-trial stage, the

State should not be allowed to change its theory after the defense had already presented its case in reliance on the Stateþs original theory. Despite Brummer's objection, the court gave the Kidnapping instruction. At that time, neither Brummer nor the court had researched lesser included offenses. Therefore, an instruction on the still lesser included offense of misdemeanor Unlawful Restraint was not given.

¶29    On October 30, 1996, the jury acquitted Brummer of all offenses charged, but found him guilty of the lesser included offense of Kidnapping. Two days later, the court, on its own initiative, notified the parties of its intent to order a new trial. On November 8, 1996, the court held a hearing on the matter. Over the State's objections, the court ordered a new trial, sua sponte, based on its conclusions that (1) the State's offer of a lesser included instruction at the close of the evidence unfairly prejudiced the defendant, and (2) the court erred in failing to instruct the jury, sua sponte, on the lesser included offense of misdemeanor Unlawful Restraint. The State appeals that order.

DISCUSSION
Issue 1

¶30    Did the District Court have authority under § 46-16-702, MCA, to grant a new trial sua sponte?

¶31    This issue presents a question of statutory interpretation which is reviewed as a question of law. State v. Bell (1996), 277 Mont. 482, 486, 923 P.2d 524, 526. Thus, we determine whether the District Courtþs interpretation of law was correct. Bell, 923 P.2d at 526.

¶32    In Montana, the statute under which a new trial may be granted is § 46-16-702, MCA, which provides:
    Motion for a new trial. (1) Following a verdict or finding of guilty, the court may grant the defendant a new trial if required in the interest of justice.
    (2) The motion for a new trial must be in writing and must specify the grounds for a new trial. The motion must be filed by the defendant within 30 days following a verdict or finding of guilty and be served upon the prosecution.
    (3) On hearing the motion for a new trial, if justified by law and the weight of the evidence, the court may:
        (a) deny the motion;
        (b) grant a new trial; or
        (c) modify or change the verdict or finding by finding the defendant guilty of a lesser included offense or finding the defendant not guilty.

¶33    The State argues that the District Court erred in granting a new trial, sua sponte, because under the plain language of § 46-16-702, MCA, the District Court has no authority to grant a new trial sua sponte. The State points to subsections (2) and (3) of the statute, and contends that the words "the motion," and "the motion must be filed by the defendant" specifically mandate that before a court may grant a new trial, the defense must make a proper request. As further support for its argument, the State cites the following two canons of statutory construction: (1)§ 1-2-101, MCA, which provides that "where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all;" and (2) § 1-2-102, MCA, which provides that "a particular intent will control a general one that is inconsistent with it." Based on these canons, the State summarily argues that a court has no authority under § 46-16-702,

MCA, to grant a new trial in the absence of a proper defense motion.

¶34    Brummer argues that the State's position ignores the plain language of subsection (1) of § 46-16-702, MCA.  He argues that subsection (1) specifically authorizes a court to grant a new trial, sua sponte, when required in the interest of justice.  Brummer also cites Baxter v. Archie Cochrane Motors, Inc. (1995), 271 Mont. 286, 287-88, 895 P.2d 631, 632, for the long-standing rule that "[t]he decision to grant or deny a new trial is within the sound discretion of the trial judge and will not be disturbed absent . . . abuse of that discretion."  Finally, Brummer argues that the State's narrow interpretation of ¶ 46-16-702, MCA, is inconsistent with ¶ 46-1-103, MCA, the statute outlining the general purposes and construction of the rules of criminal procedure.  That statute provides:

> Scope-purpose-construction.  (1) This title governs the practice and procedure in all criminal proceedings in the courts of Montana except where provision for a different procedure is specifically provided by law.
> (2) This title is intended to provide for the just determination of every criminal proceeding.  The purposes of this title are to secure simplicity in procedure, fairness in administration, and elimination of unjustifiable expense and delay.
> (3) Any irregularity in a proceeding specified by this title that does not affect the substantial rights of the accused must be disregarded.

Brummer contends that the District Court's granting of a new trial sua sponte was consistent with the Montana Legislature's stated goals of simplicity, fairness, and elimination of unnecessary expense and delay.

¶35    We hold that under § 46-16-702, MCA, the District Court had authority to order a new trial sua sponte.  However, while we agree with Brummer's ultimate position, we do not agree with most of his underlying analysis.  First, in our view, the language of § 46-16-702, MCA, is anything but plain.  While the parties here have advanced the "plain language" argument as support for their respective positions, they have focused only on the language of particular subsections of § 46-16-702, MCA, rather than on the language of the statute as a whole.  The fact that subsections (1), (2), and (3) of  the statute contain plain language individually, does not necessarily mean that the statute as a whole is plain.  Indeed, here we have a situation where subsections (2) and (3) speak of "the motion" as if it were required, yet subsection (1) seems to authorize a court to order a new trial on its own motion.  The statute does not specifically require a proper defense motion, but it also does not specifically authorize a court to order a new trial without a proper defense motion.  Thus, it appears that § 46-16-702, MCA, is ambiguous.

¶36    Second, Brummerþs reliance on Baxter is misplaced.  Baxter was a civil case in which we interpreted Rule 59(e), of Montana's civil code, not § 46-16-702 of the criminal code, which is at issue in this case.  Baxter, 895 P.2d at 633.  In Baxter, a trial courtþs authority to order a new trial sua sponte was never at issue because Rule 59(e), M.R.Civ.P., specifically provides a trial court with that authority.  Rather, at issue in Baxter was simply whether the court erred in not giving the parties notice and an opportunity to be heard regarding the courtþs order for a new trial sua sponte.  Moreover, the above rule quoted from Baxter expresses a standard of review of a courtþs decision to grant a new trial; it does not answer the question whether a court has the power to grant a new trial sua sponte.

¶37    Because the issue is one of first impression in Montana, and because the plain language analysis fails to adequately resolve the question, we look elsewhere for guidance.

¶38    Generally, courts of common law jurisdiction have, by virtue of their inherent powers, authority to set aside a verdict and grant a new trial, unless such authority is restricted or withheld by statute.   See 23A C.J.S. New Trial § 1427.   This authority embodies "the equitable concept that neither a wronged litigant nor society itself can afford to be without some means to remedy a palpable miscarriage of justice."  See 58 Am Jur 2d New Trial § 11.  For criminal cases, most courts, if not all, are authorized by statute to grant new trials, and the statute serves to define the limits on the scope of their authority to grant new trials.   See 23A C.J.S. New Trial § 1427.

¶39    Under the Federal Rules of Criminal Procedure, Rule 33 provides that "[t]he court on motion of a defendant may grant a new trial . . . in the interest of justice." (Emphasis added.) On the basis of this statute, federal courts have held that a trial judge is without authority to  order a new trial, sua sponte.  See United States v. Green (D.C. Cir. 1969), 414 F.2d 1174, 1175.

¶40    Similarly, under the California Penal Code, § 1181 provides that "[w]hen a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial . . . ."  (Emphasis added.)  In People v. Rothrock (Cal.1936), 63 P.2d 807, 808-09, the California Court of Appeals held that under § 1181, a trial court is without authority to order a new trial on its own motion.

¶41    In contrast, Rule 33 of the Colorado Rules of Criminal Procedure provides:
        (a) The party claiming error in the trial of any case may move the trial
        court for a new trial or other relief.
        . . .
        (c) The court may grant a defendant a new trial if required in the interest
        of justice.  The motion for a new trial shall be in writing . . . .

The Supreme Court of Colorado held that a trial court may order a new trial sua sponte if required in the interest of justice.  Lowe v. People (Colo. 1925), 234 P. 169, 172-73.

¶42    Similarly, the Pennsylvania Rules of Criminal Procedure, Rule 1405(B) provides that "[u]nder extraordinary circumstances, when the interests of justice require, the trial judge may, before sentencing, hear an oral motion . . . for a new trial."  The Superior Court of Pennsylvania has held:
        If a trial court determines that the process has been unfair or prejudicial,
        even where the prejudice arises as the result of actions by the court, it may,
        sua sponte, grant a new trial in the interest of justice.

Commonwealth v. Riley (Penn. 1994), 643 A.2d 1090, 1093.

¶43    Also,  § 15-17-5 of Alabamaþs Code of Criminal Procedure provides:
        On motion filed within 30 days from entry of judgment, a new trial may be
        granted for the following grounds: (1) Irregularity in the proceedings of the
        court, jury, or state or any order of court or abuse of discretion by which
        the defendant was prevented from having a fair trial[.]

In interpreting the statute, the Alabama Court of Appeals held:
        [I]nsofar as the parties litigant are concerned, a motion for a new trial must
        be in writing.  A court itself of course possesses the inherent right to ex
        mero motu grant new trials when the ends of justice so demand if such
        action is timely taken.

Pendley v. State (Ala. Ct. App. 1951), 53 So.2d 811, 813.

¶44     Finally, § 99-17-47 of the Mississippi Code Annotated provides that  "[e]very new trial granted shall be on such terms as the court shall direct."  In deciding whether a trial court could set aside a verdict and order a new trial on its own motion, the Mississippi Supreme Court recognized a court's inherent power to grant new trials on its own motion and held:

> The attention of the court has been called to no authority in this State, either constitutional, statutory, or judicial decision, which prohibits a trial judge, on his own motion, from setting aside a verdict and awarding a new trial in a criminal case where he is convinced that prejudicial error had been committed, or that the verdict was not supported by the evidence.

Sanders v. State (Miss. 1961), 125 So. 2d 923, 926.

¶45     Turning to the instant case, we believe that § 46-16-702, MCA, is more similar to the statutes of Colorado, Pennsylvania, Alabama, and Mississippi, than to the federal or California statutes.  Unlike the federal and California statutes, Montana's statute, § 46-16-702, MCA, does not specifically withhold the inherent power of the trial court to grant a new trial sua sponte.  Like Sanders, our attention has not been called to, nor has our research revealed, any authority in this state, constitutional, statutory, or judicial decision, which usurps the inherent power of the trial court to set aside a verdict and order a new trial, sua sponte, in the interest of justice.

¶46     In construing § 46-16-702, MCA, we cannot ignore an elementary rule of statutory construction:

> [T]he office of the judge is simply to ascertain or declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted.  Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all.

Section 1-2-101, MCA.  Thus, absent a lawful enactment by the Montana Legislature withholding the trial courtþs inherent power to grant a new trial sua sponte, the courtþs power stands.  Under this construction, all subsections of § 46-16-702, MCA, are given effect: so far as the defendant is concerned, he may move for a new trial, and if he so moves, his motion must be in writing and filed within 30 days of the verdict or finding of guilty; however, the right of the defendant to move for a new trial does not affect the court's inherent power to order a new trial sua sponte when required in the interest of justice.

¶47     We also note that our construction of § 46-16-702, MCA, is consistent with the purposes and construction of the rules of criminal procedure as stated by the Montana Legislature: "to provide for the just determination of every criminal proceeding . . . [and] to secure simplicity in procedure, fairness in administration, and elimination of unjustifiable expense and delay."  Section 46-1-103, MCA.

Issue 2

¶48     Given the District Court's authority to grant a new trial sua sponte, did the District Court abuse its discretion in exercising that authority and ordering a new trial in the interest of justice?

¶49     The standard of review of a district court's decision to grant or deny a new trial

is whether the court abused its discretion.  State v. Swan (1996), 279 Mont. 483, 487-88, 928 P.2d 933, 936.

¶50    The State argues that the court abused its discretion in granting a new trial because its decision to do so was based on an erroneous conclusion of law.  The State points to the court's November 1, 1996 Order notifying the parties of its intent to grant a new trial on the ground that the court failed to give an instruction, sua sponte, on misdemeanor Unlawful Restraint, a lesser included offense of Aggravated Kidnapping.  The State correctly notes that under § 46-16-607, MCA, and the Commission Comments thereunder, a defendant is entitled to a lesser included offense instruction only when there is a proper request by one of the parties.  The State argues that because § 46-16-607, MCA, precludes a court from giving a lesser included offense instruction sua sponte, the court's conclusion that it should have done so was an erroneous conclusion of law and, therefore, an improper basis for granting a new trial.

¶51    Brummer counters that the State has missed the true character of the courtþs basis for granting a new trial.  He argues that the court's basis for granting a new trial was a sense of injustice on the grand scale.  As support for his argument, Brummer quotes at length from the transcript of the hearing in which the court gave more detailed reasons for granting a new trial:

> There was no question of the intent of the two women in this case . . . to commit felony theft, as far as the court was concerned, based on the evidence.
> . . .
> Both Music and the defendant said there was sexual intercourse.  Both were seen together by two witnesses in a position that didn't involve force.  And for that reason, I think the unlawful restraint should have been given . . . .[T]he net effect is--that's really disturbing me, is heþs been confined ten months and under the gun for over a year, and heþs looking at another felony charge [kidnapping], which is selective or discriminatory prosecution
> . . . .
> . . .
> The overall feeling on it is, I think from an innate sense of justice, heþs entitled to a new trial on this issue with respect to whether they [the jury] think less than half an hour in [the small closet is] an offense that calls for not less than two years in the Montana state prison, no more than ten, versus a misdemeanor of six months and $500.00 . . . .
> . . .
> [Y]ou haven't forgotten the fact they [the jury] got rid of three main charges and they were hung up on kidnapping with respect to what is lawful authority.  [T]he overall effect of it bothered me.
> . . .
> So I guess my feelings on this go to an innate sense of justice or at least an innate sense of injustice.  I am going to grant the motion as I intended to.

The hearing transcript makes clear that the District Court's perception that it erred in not giving the instruction on Unlawful Restraint was but one factor among many leading to its "innate sense of injustice."  The District Court was quite vocal about its disdain for the State's "selective prosecution," in waiting until the close of the evidence to add the lesser charge of Kidnapping.  Also, it appears the court feared the possible situation of the jury not having the option of an Unlawful Restraint conviction, and convicting Brummer of Kidnapping simply because it was a better option than outright acquittal.  Had the court allowed the defense time to research and prepare the instruction on Unlawful Restraint, the jury may have had an option more supportable by the facts.

¶52    The State argues that even though the court violated its pre-trial order in allowing

the State's Kidnapping instruction, the violation was not so prejudicial as to call into question the interests of justice. We disagree. The following facts are undisputed: (1) both parties to this action knew about and agreed to a "10-7-4 time line" for the pre-trial submission of jury instructions; (2) both parties understood that after the pre-trial submission deadline, no party would be allowed to submit instructions absent a showing of good cause for not submitting them pre-trial; (3) the State's instructions included no lesser included offense instructions; (4) the defense planned its entire trial strategy in reliance on the State's apparent all-or-nothing strategy; (5) at trial, after the close of the evidence, the court violated its pre-trial order by allowing the State to submit a lesser included offense instruction on Kidnapping, even though the State had not shown why it could not have submitted the instruction pre-trial; and (6) the court did not give the defense time to research, prepare, and offer its own lesser included offense instruction on Unlawful Restraint.

¶53   Brummer reasonably relied upon the State's all-or-nothing strategy, as evidenced by its charging document and submitted jury instructions. It was not until the close of the evidence at trial that the State added the new charge of Kidnapping. The court believed that under these circumstances, Brummer's ability to mount an adequate defense was severely prejudiced. This, combined with the overwhelmingly contradictory witness testimony, and the court's fear that the jury was deprived of a third option more supportable by the facts, leads us to conclude that the interests of justice demand a new trial. We hold that the District Court did not abuse its discretion.

¶54   Affirmed.

/S/   WILLIAM E. HUNT, SR.

We Concur:

/S/   TERRY N. TRIEWEILER
/S/   JIM REGNIER
/S/   W. WILLIAM LEAPHART

Justice Terry N. Trieweiler specially concurs:

¶55.   I concur with all that is said in the majority opinion. I write in response to the dissent to the opinion.

¶56.   If followed, the approach advocated by the dissent would lead to absurd results. For example, pursuant to § 46-16-702, MCA, the defendant had 30 days from the date of the jury's verdict within which to move for a new trial. He presumably would have done so since he objected to the instruction which served as the basis for his conviction and has defended the District Court's decision to grant a new trial, both in the District Court and on appeal. However, he did not have the opportunity to do so because two days following the jury's verdict the District Court indicated its intention to grant the new trial without a motion and in fact did so less than two weeks after the jury's verdict.

¶57.   If the dissent's interpretation of § 46-16-702, MCA, was followed, Brummer would be denied a new trial even though he was entitled to one on the merits, simply because the District Court acted before he had an opportunity to make his own motion.

¶58.    In the alternative, the dissent would have us vacate the District Court's order granting a new trial based on the conclusion that the court had no inherent authority to do so.  We would then have to remand to the District Court; reinstate the status quo at the time the District Court acted; and, give the defendant the opportunity to move for the same relief that he has already been provided.  The court would presumably arrive at the same result, following which the State could file the same appeal, following which we would arrive at the same conclusion on the merits.

¶59.    The dissentþs approach would clearly exalt form over substance and fly in the face of § 46-1-103, MCA, which requires that criminal proceedings be resolved in a manner that avoids "unjustifiable expense and delay."  I cannot agree with that approach.  Therefore, for these reasons in addition to those set forth in the majority opinion, I concur with the majority's conclusions.

/S/  TERRY N. TRIEWEILER

Justice James C. Nelson dissents.

¶60.    I dissent from the Court's decision on Issue 1; accordingly, I would neither reach nor address Issue 2.

¶61.    I cannot agree that § 46-16-702, MCA, is ambiguous.  To the contrary, when the three subsections of this statute are read together, it is perfectly clear that the trial court has no authority to order a new trial in a criminal case absent a timely, written motion by the defendant.  The Court's analysis and interpretation of this statute are legally insupportable.

¶62.    Section 46-16-702, MCA, provides:
    Motion for a new trial.  (1) Following a verdict or finding of guilty, the court may grant the defendant a new trial if required in the interest of justice.
        (2)    The motion for a new trial must be in writing and must specify the grounds for a new trial.  The motion must be filed by the defendant within 30 days following a verdict or finding of guilty and be served upon the prosecution.
        (3)    On hearing the motion for a new trial, if justified by law and the weight of the evidence the court may:
            (a)    deny the motion;
            (b)    grant a new trial; or
            (c)    modify or change the verdict or finding by finding the defendant guilty of a lesser included offense or finding the defendant not guilty.

¶63.    It is evident from even a cursory reading of this plain and unambiguous language that, for the statute to make any sense as a whole, subsection (1) must be read in conjunction with subsections (2) and (3).  Subsections (2) and (3) refer to "the motion for a new trial."  Obviously, "the motion" is what authorizes the court to grant a new trial under subsection (1).  Only by ignoring basic English syntax and grammar can one reach the conclusion that subsections (2) and (3) stand alone; without subsection (1), "the motion" has no antecedent reference.  The majority is flat wrong in reading subsection (1) apart from the requirements of subsections (2) and (3) of § 46-16-702, MCA.  As even the title of the statute indicates, the three subsections are bound integrally to the defendant's motion.

¶64.    Moreover, contrary to the majority opinion, subsection (1) contains no explicit or implicit grant of authority to the trial court to order a new trial sua sponte.  First, under our code of criminal procedure, where the legislature has determined to give the district court power to act on its "own motion," it has plainly provided this authority by explicit statutory language.  See, for example:  §§ 46-8-115(1); 46-9-108(2);  46-11-701(2);  46-13-202(2);  46-13-401(1); 46-14-222; 46-16-403; 46-16-604; 46-18-247(1); 46-19-202(3); 46-21-105(1); and 46-23-506(4), MCA.  Just as clearly, had the legislature chosen to grant the district court the authority to order a new criminal trial on the court's own motion, it would have explicitly set out that power in § 46-16-702, MCA.  In point of fact, the legislature did not grant the district court the power to order a new trial under § 46-16-702(1), MCA, absent a predicate defense motion timely filed, and, given the aforementioned scheme of our criminal procedure code, it is improper that we here presume the existence of such a power from the non-existence of language specifically authorizing it.  Indeed, we must infer exactly the opposite.

¶65.    Second, finding no explicit language in § 46-16-702, MCA, to support its determination that the District Court can grant a new trial sua sponte, the majority states in summary fashion that the court has "inherent" power to order a new trial.  Notably, it cites no Montana statutory or constitutional authority in support of this conclusion, conceding, as it must, that none exists.

¶66.    Rather, the Court advances the novel proposition that unless the legislature specifically prohibits a court from exercising a certain power (or, in the words of the majority, unless the legislature "usurps" the court's power) then the court has "inherent" authority to act.  This rationale turns our entire code of criminal procedure on its head.  This code is based upon legislative direction as to how the court is to proceed and what the tribunal is authorized or directed to do at various stages of a criminal investigation and prosecution.  The code of criminal procedure is not premised upon the concept that the court, drawing on some undefined reservoir of "inherent" power, can act in any way it chooses subject only to legislative limitation of those choices.

¶67.    While certainly a court may exercise those powers inherent in or that derive from powers which are specifically granted by the constitution or by statute, that is a far different and much narrower concept than what is being declared here--i.e., that a court's power to act is limited only to the extent that the legislature passes a specific law prohibiting the act.  Aside from the fact that the majority cites no authority for this sweeping concept of "inherent" power, what authority exists is not even consistent with this view.

¶68.    In Clark v. Dussault (1994), 265 Mont. 479, 878 P.2d 239, we observed that the concept of inherent power is codified at § 3-1-113, MCA, "which provides that when jurisdiction is conferred on a court or judicial officer, all the means necessary for the exercise of that jurisdiction are also given."  Clark, 878 P.2d at 243.  Based upon long-standing precedent, we then went on to point out that a court's exercise of this inherent power is limited to situations where "established methods fail or an emergency arises."  Clark, 878 P.2d at 243 (citations omitted).

¶69.    Indeed, before embracing this expansive view of of inherent power, the majority would do well to recall our statement in State v. Bonner (1950), 123 Mont. 414, 214 P.2d 747:

    Judicial power as contra-distinguished from the power of the law has no existence.  Judicial power is exercised by means of courts which are the

> mere creations and instruments of the law, and independent of the law the courts have no existence. The law precedes the courts. The law governs the courts. Thus it is the function of the courts to expound and administer law in those causes properly brought before them in course of legal procedure.

Bennett, 214 P.2d at 753.

¶70.   The majority's perverse and unsupported notion that a court inherently can exercise any power not specifically prohibited by the legislature aside, the fact is that, in the matter at issue, the legislature has established the method by which a new trial can be granted by a court in a criminal case. And, as pointed out above, this method--set forth in § 46-16-702, MCA--unambiguously requires that the request for a new trial come from the defendant by written motion filed within a time certain. The legislature having, thus, clearly established the law (and absent the law being unconstitutional), neither the district court nor this Court may imply authority in excess of that conferred by the statute on the basis of some amorphous and ill-defined concept of "inherent" power.

¶71.   Finally, the majority's citation to secondary authorities, to the statutes and decisions of other jurisdictions (none of which involve language remotely akin to § 46-16-702, MCA), and to § 46-1-103, MCA, (a statute which, as to the specific issue here, is meaningless in its generality), only points up how far afield the Court has had to travel in its attempt to justify a statutory construction that finds no support in the plain language of the statute itself.

¶72.   Indeed, while the majority criticizes the State for not focusing on the entirety of § 46-16-702, MCA, it is not the State, but this Court which tears apart the fabric of the statute so as to construct from whole cloth an interpretation justifying the trial court's patently unauthorized ruling. In doing so, the majority wholly ignores the most fundamental rule of statutory construction:

> Role of the judge -- preference to construction giving each provision meaning. In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted. Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all.

Section 1-2-101, MCA. It is ironic, indeed, that the Court cites this same statute as authority for its opinion, for in violation of § 1-2-101, MCA, the majority has inserted into § 46-16-702, MCA, a provision allowing the district court to order a new trial sua sponte and it has failed to read subsections (1), (2) and (3) of § 46-16-702, MCA, pari materia. Worse, it has accomplished this feat by manufacturing ambiguity in § 46-16-702, MCA, where absolutely none exists.

¶73.   As to Justice Trieweiler's concurrence, while he makes a valid point about the trial court effectively preempting Brummer's ability to move for a new trial under § 46-16-702, MCA, we have already established a precedent, limited in scope, which deals with this sort of problem. In State v. Barrack (1994), 267 Mont. 154, 882 P.2d 1028, we dealt with a situation where the defendant filed an untimely motion for a new trial and the district court, treating this motion as a petition for post-conviction relief, heard and eventually denied the motion. On appeal the State argued that the court erred in considering the untimely new trial motion and that it should simply have been summarily denied. Barrack, 882 P.2d at 1031. We agreed that the defendant's motion was untimely and that the trial court erred in treating it as a petition for post-conviction relief. Notwithstanding, we ruled that because of the court's improper treatment of this motion,

Barrack was effectively lulled into curtailing any effort to directly appeal his case, and, thus, technically forfeited his right to appellate review.  On these unique facts and because of the court's error prejudicing the defendant's right to pursue a statutory remedy, we affirmed the court's decision to rule on the merits of Barrack's untimely new trial motion.  Barrack, 882 P.2d 1031-32.

¶74.    The same procedure could--and should--be followed here.  It would be a simple matter for the majority to rule that, because the District Court wrongfully preempted Brummer's right to move for a new trial by ordering a new trial, sua sponte, the Court would address the merits of whether a new trial should have been granted or not (presuming that the defendant would have moved for one himself).  Barrack is authority for doing precisely that.  Were we to follow that approach in the case at bar, there would be no need to engage in misreading  the statute, in finding ambiguity where none exists, and in granting trial courts power that they do not have.   There would, in short, be no need to throw out the baby with the bath water, as the majority has done here.

¶75.    I would hold that, under § 46-16-702, MCA, a district court may not grant a motion for new trial in a criminal case absent a timely, written motion by the defendant. I dissent from the Court's failure to do so.

/S/   JAMES C. NELSON

Chief Justice J. A. Turnage and Justice Karla M. Gray concur in the foregoing dissent.

/S/  J. A.  TURNAGE
/S/   KARLA M. GRAY