FILED

February 23 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0052

DA 14-0052

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 51

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

BARNEY ALLEN MORSE,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Third Judicial District,
In and For the County of Anaconda-Deer Lodge, Cause No. DC 12-45
Honorable Ray Dayton, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Amy Eddy, The Law Offices of Amy Eddy, PLLP, Kalispell, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, C. Mark Fowler, Assistant Attorney General, Helena, Montana

          Joan Borneman, Anaconda-Deer Lodge County Attorney, Anaconda, Montana

Submitted on Briefs: November 13, 2014
Decided: February 23, 2015

Filed:

                          Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Barney Allen Morse appeals the judgment of conviction for sexual intercourse without consent and the order denying his motion for new trial entered by the Third Judicial District Court, Anaconda-Deer Lodge County.

¶2 Morse presents the following issues for review:

> *1.    Did the District Court abuse its discretion when it denied Morse's untimely motion for new trial and directed Morse to pursue postconviction relief?*
>
> *2.    Did the District Court abuse its discretion when it allowed the State to elicit testimony from the victim's sisters about Morse's past conduct?*

We reverse and remand for further proceedings as to Issue One.  Based on our resolution of Issue One, we do not reach the merits of Issue Two.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 H.S. is the adult daughter of Morse's girlfriend.  H.S. is married and has three children.  At the time of the incident on September 17, 2012, she had known Morse for several years.  H.S. suffers from spinal neuropathy related to childbirth and has chronic back pain.  She is prescribed lorazepam, a muscle relaxer, for pain relief and relief from muscle spasms.  H.S. knew Morse was friends with a local chiropractor and believed Morse knew certain chiropractic techniques which would help with her back pain.  Morse had given H.S. "minor adjustments" in the past.

---

[1]    Morse maintains that the District Court should have prohibited the State from introducing evidence of his past conduct pursuant to M. R. Evid. 403 and 404(a) and (b).  In light of our resolution of Issue One and our remand for further proceedings, however, we decline to render an advisory opinion and instead recognize that the parties will be in the same position as if there had been no trial.  Section 46-16-701, MCA.

2

¶4 On September 17, 2012, H.S. was experiencing severe back pain and discussed with her mother and Morse taking a muscle relaxer and having Morse give her a massage. H.S.'s mother agreed to watch her children because H.S. was concerned about her children's welfare knowing the muscle relaxer would make her "very tired" and unable to care for her children. H.S. took the medication and Morse and her mother transported H.S. back to her home where Morse accompanied her into a back room and began the massage.

¶5 H.S. described that the massage went on for five hours. Morse would touch her feet which would make her legs twitch and activate certain nerve areas. She explained that this would wake her up a bit. H.S. testified:

> Q: [Prosecutor] Okay. What happened after that?
> A. [H.S.] He had – He had spread my legs, and he was massaging his way up my legs. I remember at a given point that, over the course of the time that we were in there, he was massaging my butt and he, uh—he had put his fingers inside of me.
> Q. Can you describe how you're so sure that he put his fingers inside of you?
> A. Because I could feel it and he was moving, he was moving them.
> Q. How was he moving them?
> A. Like moving them (indicating).
> Q. [H.S.], why didn't you tell him to stop?
> A. My Mom ended up coming in.
> Q. What happened when your mom came in?
> A. That's when – well, he still, he had his fingers inside of me at that point, because my mom walked in kind of right in the middle of that. And he grabbed my right forearm because my mom, she asked how I was doing, and I tried to answer but it was kind of garbled because my face was in the massage pillow; and Barney was squeezing my arm, telling me not to answer.
> Q. He verbally told you not to answer?
> A. No, he just squeezed my arm.

¶6      H.S.'s mother testified that she walked in to the massage room several times when Morse was giving H.S. a massage.  She testified that H.S. did not answer and Morse was "standing still" when she walked in the last time.  H.S's mother left the room.  H.S. testified that Morse left after her mother came into the room.

¶7      H.S. described that she went to the bathroom because she felt like she had to urinate and realized "that I had human bodily fluids on . . . my legs and in my private area."  H.S. explained that she was "grossed out" and that she "was pretty positive it was mine, and I was worried that some of it was his, but I knew at least some of it was mine."

¶8      The State admitted into evidence a picture of H.S.'s shorts that she was wearing during the incident.  The crime lab outlined on the shorts stains that had fluoresced during the Crime Lab's examination.  Lacey Van Grinsven, a forensic scientist with the State Crime Lab, testified that she did not find semen or blood stains on the shorts and that the crime lab cannot test for vaginal fluid.

¶9      The defense attempted to discredit H.S. by showing that, before trial, H.S. had given statements to investigators that she thought the body fluid was semen from Morse, but upon learning the Crime Lab did not find semen changed her testimony to indicate the bodily fluid was hers.  H.S. testified during cross examination as follows:

> Q. [Defense counsel] So on that day, you told our investigator that it was slimy white stuff, correct?
> A. [H.S.] Yes, it was definitely bodily fluids.
> Q. And you said, to quote you, "That obviously wasn't mine.  There was a lot of it."  You said that correct?
> A. I do not know for sure exactly how much of it is mine, how much of it is his.  I know that it was there; and during that statement, I was extremely upset.

H.S. testified that "I was meaning it could not have been all mine because there was a lot of it."

¶10    The State described in its opening statement that H.S. "could just feel him inside of her vagina," but that H.S. could not scream out because of the effects of the muscle relaxer. The State said that H.S. will tell the jury that "[H.S.] checked her shorts, and her vaginal area was all wet. She's [H.S.] going to tell you it looked like a white, creamy substance," and, although the Crime Lab could not test for vaginal fluid, that "[H.S.] will tell you her shorts were wet, and that material looked as if she had just had sex." During closing argument the State argued that "[Morse] digitally penetrated her to the point that she had so much bodily fluid on her legs and around her vagina that she thought it might be somebody else's." The State argued:

> You'll notice those are the shorts that she was wearing that night, by her own testimony. Notice the stains around the front, crotch. Now, could those be something besides vaginal fluid? Absolutely. Could be urine. Could be beer. Or it could be evidence of the large amount of fluid she had on her because the Defendant had repeatedly digitally raped her while he was in that room, is what it could be. There's strong corroborative evidence.
> Now, the Defense, of course, makes a big deal out of the fact that [H.S.] basically wasn't sure what this stuff was on her, that she was afraid at one point that it might be semen. Well, can you blame her? I mean, imagine as she walks out of this room, she doesn't know what he did when she was asleep. She knows when she was awake, he had his fingers in her, and then she finds all this fluid around her vagina.
> Well, wouldn't it be a reasonable assumption that maybe it was sperm? She was afraid it was. She probably did think it was sperm. And then when she finds out from the Crime Lab that it was not sperm, she is relieved that she wasn't raped by him while she was asleep with his penis. Instead it was his fingers, and she was relieved. At that point, yeah, she did think it was vaginal fluid. What else would it be? She knew she had all this stuff on her legs.

5

¶11 On March 20, 2013, after the testimony of many other witnesses, including Morse, the jury found Morse guilty of sexual intercourse without consent. On April 19, 2013, Morse filed a motion for new trial arguing that there was insufficient evidence to convict and that he was unfairly prejudiced by the admission of alleged prior bad acts. The District Court denied the motion at a hearing on May 20, 2013.

¶12 Eleven days later, on May 31, 2013, Detective Ken Walund received a report that H.S. had claimed her husband sexually assaulted her. Walund interviewed H.S. that same day regarding these allegations. Afterward, H.S. told Walund that she was beginning to think that Morse may have been just trying to help her. H.S. also stated that after having time to sleep on it and think, she now remembered that the wetness on her was urine because she wet herself. Walund informed H.S. that it was very important to get the facts right and H.S. said she understood. H.S. agreed to come back on June 4, 2013.

¶13 During a subsequent telephone conversation with Walund, H.S. confirmed a second time that she remembered the wetness on her was urine because she now remembered wetting herself. On July 16, 2013, during a third, recorded interview with Walund and the prosecutor, H.S. again confirmed that she thought the bodily fluid in her vaginal area had been urine and explained, "I did relax to the point where I obviously peed myself, because you know I can't, can't feel my, anything from the waist down, then what I do feel was not right."

¶14 Based upon H.S.'s post-trial statements, Morse filed a First Amended Motion for New Trial on September 4, 2013. Although the motion was untimely pursuant to § 46-16-702(2), MCA, the District Court nevertheless conducted a second hearing on

October 21, 2013. The District Court considered the briefs and arguments of counsel regarding the post-trial statements of H.S. and heard testimony from Walund and H.S. The District Court appreciated that if "I decide [the motion] is untimely" and the "Supreme Court affirms me . . . he stays in jail." The District Court further observed that immediately pursuing a petition for postconviction relief would require Morse to forego an appeal, and that "there were important evidentiary rulings during the trial that I'm sure [Morse] is going to want to have looked at" through an appeal. The District Court recognized the situation as "problematic" and acknowledged that "there might be strong enough evidence that's newly discovered that would warrant the Court allowing the motion for new trial to be considered and ruled upon after the 30-day time limit." Next, Walund testified that H.S. had informed him that she urinated on herself. H.S. testified that she had, in fact, made these statements to Walund and the prosecutor. H.S. explained that "[w]hen I lose feeling from my waist down, I try really hard, I mean, I'm always worried that I'm going to lose control of my bladder; but when I get worried like that, I just make sure I go use the bathroom."

¶15 Based upon our review of the transcript, it is clear the District Court understood that H.S. had contradicted her trial testimony by stating that the wetness in her vaginal area was urine rather than vaginal fluid and that she had no feeling from the waist down. The District Court stated at the hearing: "and then the statement that she made post trial, post motion to amend, that she has no feeling below her waist when she was, I mean, she did not say, [during the trial] 'I saw him do it.' She said, 'I felt him do it,' and then says, 'I had no feeling below the waist.'" The district judge asked "Now is the jury going to

acquit based upon those two pieces of evidence?  I don't know, but I'll tell you, I think it would be a different trial."  The court observed that H.S. now says, "I peed myself," and that this was not available at the time the original motion for new trial was made.  "The jury could easily put quite a bit of weight on the fact that, well, God, she's got all this vaginal fluid on her shorts.  That doesn't happen with a massage unless there's digital manipulation, stimulation, you know.  That's why [the prosecutor] presented it to the jury."

¶16    On October 25, 2013, the District Court denied Morse's request for a new trial.  In doing so, the court observed:

> Of particular concern to the Court, H.S. has made post-trial statements suggesting that the substance on her legs and vagina was her own urine and that she could not feel anything from the waist down at the time Defendant digitally penetrated her.  H.S.'s post-trial statements appear to contradict some of her trial testimony and arguments made by the State during trial.  Although the Court is concerned about the matters raised in Defendant's Amended Motion for New Trial, it concludes the motion is time barred under section 46-16-702, MCA, and that no exception to the time bar applies.

The court further declined to create an exception to the 30-day time limitation, finding that Morse's "circumstances do not give rise to constitutional due process implications that transcend the otherwise clear and unambiguous requirements of section 46-16-702, MCA."  Believing that H.S.'s statements could be adequately addressed in postconviction proceedings, the court concluded that although it had the authority to consider Morse's motion sua sponte, the interests of justice did not require granting a new trial given the availability of this collateral proceeding.

¶17   On December 3, 2013, the District Court sentenced Morse to 15 years in prison, with 10 years suspended.  The judgment was stayed and Morse was released on his own recognizance pending appeal.

## STANDARDS OF REVIEW

¶18   We generally review a district court's decision to grant or deny a motion for new trial for an abuse of discretion.  *State v. Clark*, 2005 MT 330, ¶ 18, 330 Mont. 8, 125 P.3d 1099 (*Clark I*).  To the extent that a district court makes findings of fact, those findings must be made by a preponderance of the evidence and will be reviewed for clear error. *Clark I*, ¶ 39.   Where a district court exercises its discretion, its decisions will be reviewed for an abuse of discretion.  *Clark I*, ¶ 39.   Whether a district court has the authority to grant a new trial pursuant to § 46-16-702, MCA, is a matter of statutory interpretation, and reviewed as a question of law.  *State v. Brummer*, 1998 MT 11, ¶¶ 30-31, 287 Mont. 168, 953 P.3d 250.

## DISCUSSION

¶19   *1.  Did the District Court abuse its discretion when it denied Morse's untimely motion for new trial and directed Morse to pursue postconviction relief?*

¶20   The State argues that the District Court could not order a new trial in response to Morse's September 4, 2013 motion because § 46-16-702(2), MCA, requires that the motion be filed within 30 days following the verdict.  The State also maintains that because Morse moved for a new trial, the District Court could not act sua sponte under § 46-16-702(1), MCA, and that Morse should not be allowed to rely on the District Court's sua sponte authority to circumvent the 30-day statutory limitation, thereby rendering the provisions of subsection (1) useless.  Morse argues that his case falls within

9

an exception to the 30-day limitation, because he will be denied due process if he is required to serve a sentence for sexual intercourse without consent when it is known the victim has recanted material parts of her trial testimony.  Morse additionally argues that the 30-day limitation should not prevent the court from ordering a new trial, because the plain reading of § 46-16-702(1), MCA, demonstrates that a district court has the power to grant a new trial in the interests of justice, no matter how it learns of the facts that require a new trial.

¶21    Section 46-16-702, MCA, the statute under which a new trial may be granted or denied, provides:

> (1) Following a verdict or finding of guilty, the court may grant the defendant a new trial if required in the interest of justice.  A new trial may be ordered by the court without a motion or may be granted after motion and hearing.
>
> (2) The motion for new trial must be in writing and must specify the grounds for a new trial.  The motion must be filed by the defendant within 30 days following a verdict or finding of guilty and be served upon the prosecution.
>
> (3) On hearing the motion for a new trial, if justified by law and the weight of the evidence, the court may:
>
> > (a) deny the motion;
> >
> > (b) grant a new trial; or
> >
> > (c) modify or change the verdict or finding by finding the defendant guilty of a lesser included offense or finding the defendant not guilty.

¶22    The question of whether an untimely new trial motion precludes substantive review of the defendant's request has been raised numerous times in this Court, as well as addressed by the Legislature.  Subsection (1) has no express time limitation, whereas

10

subsection (2) requires that the defendant's motion be filed within 30 days following a verdict or finding of guilty. There have been many instances in which we have considered the merits of defendant's untimely request, *State v. Moore*, 268 Mont. 20, 58, 885 P.2d 457, 481 (1994), *overruled in part by State v. Gollehon*, 274 Mont. 116, 122, 906 P.2d 697, 701 (1995); *State v. Barrack*, 267 Mont. 154, 161-62, 882 P.2d 1028, 1032 (1994); *State v. Redcrow*, 242 Mont. 254, 259, 790 P.2d 449, 452 (1990), *overruled in part by Gollehon*, 274 Mont. at 122, 906 P.2d at 701; *State v. Perry*, 232 Mont. 455, 462-63, 758 P.2d 268, 272-73 (1988), *overruled on other grounds by Clark I*, ¶ 32, and as many in which we found the untimely motion was a procedural bar to consideration of the merits, *State v. Sirles*, 2010 MT 88, ¶ 37, 356 Mont. 133, 231 P.3d 1089; *State v. McCarthy*, 2004 MT 312, ¶ 42, 324 Mont. 1, 101 P.3d 288; *Gollehon*, 274 Mont. at 117, 906 P.2d at 698 (construing previous version of § 46-16-702, MCA); *State v. Best*, 161 Mont. 20, 26, 503 P.2d 997, 1001 (1972), *overruled in part by Gollehon*, 274 Mont. at 122, 906 P.2d at 701. Because it is undisputed that Morse's motion was filed beyond the 30-day time limitation set forth in subsection (2), these proceedings require us to construe the provisions of subsection (1), which were also specifically considered by the District Court.

¶23 We interpreted the provisions of subsection (1) in *Brummer*, ¶ 46, and held that "the right of the defendant to move for a new trial does not affect the court's inherent power to order a new trial sua sponte when required in the interest of justice." We determined that "absent a lawful enactment by the Montana Legislature withholding the trial court's inherent power to grant a new trial sua sponte, the court's power stands."

*Brummer*, ¶ 46. We specifically acknowledged "'the equitable concept that neither a wronged litigant nor society itself can afford to be without some means to remedy a palpable miscarriage of justice.'" *Brummer*, ¶ 38 (quoting 58 Am. Jur. 2d *New Trial* § 11); *see also State v. Marker*, 2000 MT 303, ¶ 11, 302 Mont. 380, 15 P.3d 373. We also noted that

> our construction of § 46-16-702, MCA, is consistent with the purposes and construction of the rules of criminal procedure as stated by the Montana Legislature: "to provide for the just determination of every criminal proceeding . . . [and] to secure simplicity in procedure, fairness in administration, and elimination of unjustifiable expense and delay."

*Brummer*, ¶ 47 (quoting § 46-1-103, MCA).

¶24 In response to our observation in *Brummer* that § 46-16-702, MCA, contained certain ambiguities regarding the court's authority to consider a new trial, the 1999 Montana Legislature amended subsection (1) to specifically allow the court to order a new trial either "without a motion or after motion and hearing." 1999 Mont. Laws 301. The Legislature did not place any limitations on the court's authority to grant a new trial whenever required by the interests of justice. In responding to *Brummer* with an amendment to § 46-1-702(1), MCA, we can only assume that the Montana Legislature accepted the equitable principles we enunciated in *Brummer* that served as a basis for our decision that "the right of the defendant to move for a new trial does not affect the court's inherent power to order a new trial sua sponte when required in the interest of justice." *Brummer*, ¶ 46.

¶25 Following *Brummer* and the 1999 amendment, we again reiterated in *Marker*, ¶ 11 (construing § 46-16-702, MCA (1997)), that the time and notice requirements applicable

12

to a motion for new trial do not apply to a district court acting sua sponte. We specifically rejected the State's argument that the district court is bound by the 30-day deadline for the filing of a defendant's motion for new trial set forth in § 46-16-702(2), MCA, when it is acting pursuant to § 46-16-702(1), MCA. *Marker*, ¶ 11. In so doing, we again recognized "'[t]his authority embodies "the equitable concept that neither a wronged litigant nor society itself can afford to be without some means to remedy a palpable miscarriage of justice."'" *Marker*, ¶ 13 (quoting *Brummer*, ¶ 38). These equitable principles guide us here as well. A court is not rendered powerless to act upon learning of facts potentially warranting a new trial simply because it learned of those facts through an untimely defense motion. Placing such an interpretation on subsection (1) is inconsistent with the plain language of the statute, *Brummer*, *Marker*, and our precedent recognizing that a court has the inherent authority to grant a new trial and thereby "remedy a palpable miscarriage of justice."

¶26 The State argues that because Morse moved for a new trial, the District Court cannot act sua sponte under § 46-16-702(1), MCA. However, subsection (1) states: "Following a verdict or finding of guilty, the court may grant the defendant a new trial if required in the interest of justice." In construing § 46-16-702, MCA, we cannot ignore an elementary rule of statutory construction that the "office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. Although this Court used the phrase "sua sponte" in *Marker* and *Brummer* when discussing subsection (1), the Legislature did not insert "sua sponte" into subsection (1). The

language of the statute is clear that a court has the authority to consider granting a new trial and is guided in its decision only by the interest of justice. Situations too innumerable to account for in statutory language may arise in the context of people's lives and a criminal trial which would warrant consideration of a new trial. The Legislature did not insert a time limitation on the court's authority to act under subsection (1), nor did it restrict the manner in which the issue may first be raised. We decline to do so here.

¶27 We are also mindful of the rule of statutory construction that "[w]here there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." Section 1-2-101, MCA. To hold that a defense motion, considered untimely under subsection (2), precludes the court from considering under subsection (1) facts which potentially warrant a new trial would render, in part, the provisions of subsection (1) ineffective. A court would not be able to consider granting a new trial simply because of an untimely motion. The untimely motion may have been filed to protect an alternative argument, as here, that an exception to the 30-day time limitation under subsection (2) should be applied. *See Perry*, 232 Mont. at 462, 758 P.2d at 272. Such an interpretation places a limitation on the court's inherent authority to consider granting a new trial under subsection (1). This limitation is not only absent from the statutory language itself, but inconsistent with our precedent as set forth primarily in *Brummer* and *Marker*.

¶28 We also observe that the analysis set forth in *Gollehon*, 274 Mont. at 118-22, 906 P.2d at 699-702, which arrived at a narrower construction of § 46-16-702, MCA, and

14

revisited several of our precedents, occurred prior to the 1999 amendments addressing a district court's authority to order a new trial with or without a motion. Those amendments have resulted in an inherent tension: subsection (2) contains a specific time limitation, while subsection (1) does not. This tension requires a new analysis. A construction that recognizes a district court's inherent power to grant a new trial, and yet renders a defendant unable to communicate to the court circumstances that would justify invocation of that power, does not adequately effect the intent of the 1999 amendments.

¶29 There are instances, such as what occurred here, where the facts warranting the new trial did not arise from the trial itself, but rather came from post-trial statements of the victim made after expiration of the 30-day time limitation and prior to sentencing. A court can only learn of this information through the filing of a motion which will be untimely under subsection (2). Here, the District Court determined the motion was untimely pursuant to subsection (2) and could have ended with that, as it noted—"[i]f I'm right, the Supreme Court affirms me, the motion was denied, he stays in jail." However, the District Court continued and extensively considered the propriety of granting a new trial under subsection (1), observing that the post-trial statements were very concerning. We agree with the District Court that these facts warranted a more thorough examination of whether to grant a new trial and that the timing of the newly discovered evidence was problematic. We appreciate the dilemma the District Court perceived it was in. However, the provisions of subsection (1) allow the District Court to provide a remedy under these circumstances when required by the interests of justice. The District Court's final decision, made pursuant to subsection (1), is subject to review by this Court.

15

¶30 We must now consider whether the District Court abused its discretion in denying a new trial. Normally, our review under subsection (1) has been of a court's decision to grant, rather than deny, a new trial. However, as explained above, there are no procedural limitations which would foreclose our review on the merits of the court's decision to deny Morse a new trial. Significantly, we note that the District Court considered extensively the briefs filed by the parties, oral argument, documentary evidence, and testimony from the lead detective and the victim. Although ultimately deciding to deny Morse a new trial, the District Court nevertheless found that H.S.'s post-trial statements contradicted her trial testimony and that they were concerning.

¶31 In *Clark I*, ¶ 34, this Court set forth the following five-part test when considering motions for new trial based upon newly discovered evidence such as post-trial statements from the victim:

> To prevail on a motion for a new trial grounded on newly discovered evidence, the defendant must satisfy a five-part test:
>
> (1) The evidence must have been discovered since the defendant's trial;
>
> (2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part;
>
> (3) the evidence must be material to the issues at trial;
>
> (4) the evidence must be neither cumulative nor merely impeaching; and
>
> (5) the evidence must indicate that a new trial has a reasonable probability of resulting in a different outcome.

*See also Crosby v. State*, 2006 MT 155, ¶ 21, 332 Mont. 460, 139 P.3d 832 ("[T]he court should consider all five of the *Clark I* factors, including, importantly, whether a new trial would have *reasonable probability* of resulting in a different outcome. Under this test,

16

the court does not pass on the ultimate truthfulness of the recanting testimony; rather, provided the five *Clark I* factors are satisfied, the court leaves the determination to the fact-finder on retrial." (Emphasis in original.)) These factors should likewise be applied by the trial court when considering a new trial under subsection (1).

¶32 There can be no dispute that Morse has met factors (1) and (2) of the *Clark I* test. H.S.'s post-trial statements, made to law enforcement, followed Morse's verdict by only two months. Defense counsel acted promptly in bringing the matter to the court's attention by filing an amended motion for new trial.

¶33 In considering whether H.S.'s statements were material to issues at trial, we observe that H.S.'s statements at trial regarding the bodily fluid in her vaginal area corroborated that she had been digitally stimulated. This was the primary purpose for the State's introduction of the shorts into evidence. Indeed, the State argued that the bodily fluid was "strong corroborative evidence" that Morse had "repeatedly digitally raped her while he was in that room." Further, H.S.'s statement that she could not feel anything from the waist down is also material given that her trial testimony was that she could feel, as opposed to see, Morse inserting his fingers into her vagina. H.S.'s post-trial statements are neither cumulative nor merely impeaching, but are rather material to whether there actually was digital penetration. Morse has satisfied (3) and (4) of the *Clark I* test.

¶34 As the District Court noted, "the primary issue in the case" was whether H.S. had been digitally penetrated. The trial testimony and argument explaining that the bodily fluid was likely vaginal fluid was strong corroborative evidence that penetration had

17

occurred. When H.S. subsequently testified that she remembered she had urinated on herself and that she could not feel anything from the waist down, it is likely, as the District Court observed, that "it would be a different trial." We conclude that there is a reasonable probability that had the jury considered H.S.'s post-trial statements, the outcome would have been different. Morse has accordingly satisfied (5) of the *Clark I* test.

¶35 Here, the District Court denied Morse a new trial after it determined Morse could address the victim's post-trial statements through the collateral remedy of a petition for postconviction relief. The proceeding before the court, however, was not a petition for postconviction relief, but rather a new trial motion based upon allegedly material and substantive recantations by the victim, supported by testimony and documentary evidence, made only 11 days after a hearing on Morse's original new trial motion and just two months following Morse's guilty verdict. The availability of a remedy not currently before the court should not displace an application of the *Clark I* factors relevant to a new trial analysis. We note that at the time the District Court denied Morse a new trial, Morse had not been sentenced, and thus he had no right of appeal and could not have filed a petition for postconviction relief. M. R. App. P. 4(5)(b); § 46-21-102, MCA.[2] Under the circumstances of this case, we cannot require a defendant to forego an appeal in order to

___

[2] We realize that Morse has asked this Court to carve out an exception under subsection (2) to the 30-day time limitation based upon Morse having no other remedy or avenue for relief. *See Gollehon*, 274 Mont. at 122, 906 P.2d at 701; *Perry*, 232 Mont. at 462, 758 P.2d at 272. However, because we are granting Morse relief under the provisions of subsection (1), we will not address whether to make an exception under subsection (2).

first pursue relief through a postconviction proceeding, while serving a sentence of incarceration, when the court could provide an immediate remedy of granting a new trial.

**CONCLUSION**

¶36 We conclude the District Court abused its discretion when, in considering whether Morse was entitled to a new trial pursuant to § 46-16-702(1), MCA, it failed to apply the *Clark I* factors and instead determined that postconviction proceedings were best suited to address H.S.'s post-trial statements. After applying the *Clark I* factors to H.S.'s post-trial statements, in light of her testimony and other evidence, we are convinced that Morse should be granted a new trial. We reverse the District Court's order denying Morse a new trial.

/S/ LAURIE McKINNON

We Concur:

/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ JAMES JEREMIAH SHEA

Justice Jim Rice, concurring in part and dissenting in part.

¶37 I concur in the Court's decision to grant relief to Morse and to remand this matter for a new trial. I strongly disagree with the Court's approach in reaching this determination and the legal analysis undergirding it. The Court admittedly negates the 30-day requirement imposed by the Legislature upon motions for new trial, and justifies this decision by asserting that the Legislature has essentially repealed it. I dissent from

19

this conclusion, which I believe blatantly breaches our judicial duty under the Constitution.

¶38    In *State v. Barrack*, 267 Mont. 154, 882 P.2d 1028 (1994), the defendant filed an untimely motion for new trial, which the District Court erroneously treated as a petition for postconviction relief.  *Barrack*, 267 Mont. at 160-61, 882 P.2d at 1031.  Barrack was thereby placed into a quandary, having to choose between pursuing his request for a new trial and abandoning his right to appeal, or abandoning his new trial request in favor of pursuing an appeal.  Under those circumstances, we concluded it was the best course to entertain Barrack's untimely new trial motion on its merits.  *Barrack*, 267 Mont. at 161-62, 882 P.2d at 1032.  We were careful to emphasize that our decision was based upon the unusual circumstances that resulted in Barrack's forfeiture of a remedy, and that nothing in our decision was to be read as "diminishing a defendant's obligation to timely file a motion for a new trial and a petition for post-conviction relief or appeal in accordance with the applicable statutes."  *Barrack*, 267 Mont. at 162, 882 P.2d at 1032.  Here, Morse was placed in a similar quandary.  His motion for new trial was untimely due to the timing of the victim's recantation.  At that point, he could either abandon his right to appeal, including the trial issues he sought to raise on appeal, in order to seek postconviction relief regarding the recantation, or he could forego that relief in order to pursue his appeal issues.  Thus, I would conclude that Morse faced an unavoidable forfeiture of remedy as in *Barrack*, reach the merits of his motion despite its untimeliness, and grant a new trial, again emphasizing that this does not alter the generally governing obligations "to timely file a motion for a new trial and a petition for

post-conviction relief or appeal in accordance with the applicable statutes." *Barrack*, 267 Mont. at 162, 882 P.2d at 1032. Such an approach would preserve the Legislature's 30-day time frame for motions for new trial alongside our precedent that provides relief in the extraordinary circumstances where forfeiture of a remedy is unavoidable.

¶39 Instead, the Court engages in a lengthy analysis that concludes the Legislature has disavowed altogether the 30-day time limit for new trial motions under § 46-16-702(2), MCA, and that the limit no longer remains in effect, despite the fact that it remains in the Code. The Court holds that a court is broadly authorized to grant a new trial even if requested by "an untimely defense motion." Opinion, ¶ 25. Obviously, if an *untimely* defense motion can be considered in the same way as a *timely* defense motion, then the 30-day time limit is rendered null and void. The Court's reasoning for this conclusion is that "[s]ituations too innumerable to account for in statutory language may arise in the context of people's lives and a criminal trial which would warrant consideration of a new trial." Opinion, ¶ 26. This statement may well be true, but it is merely a policy argument that the Legislature could consider as reason for repealing the statute, not a legal basis for a court to negate it. I cannot countenance this abolishment of a legislative enactment.

¶40 The Court reasons that our decision in *Brummer* and the Legislature's revision to subsection (1) has somehow altered the statute. The Court states that "we can only assume that the Montana Legislature accepted the equitable principles we enunciated in *Brummer*." Opinion, ¶ 24. However, the Legislature did no such thing.

¶41 The 30-day provision of subsection (2) was not at issue in *Brummer*. The issue there was whether a district court had the authority under subsection (1) to order a new

trial *sua sponte*.  It was in this regard that we cited equitable principles affording "some means to remedy a palpable miscarriage of justice" before concluding a court had the power to order a trial *sua sponte* under subsection (1).  *Brummer*, ¶ 38 (quotations omitted).  Nor did we hold that a court could order a new trial "through an untimely defense motion," as the Court holds.  Opinion, ¶ 25.  That would have rendered subsection (2) superfluous.  The trial court in *Brummer* had ordered a new trial *sua sponte*, and we simply held, over the State's objection, that a court was authorized to do so *without a motion* pursuant to subsection (1).  Our holding did not alter the statutory requirements for motions for new trial filed by a defendant, which are expressly governed by subsection (2), including the 30-day requirement.  We explained this point explicitly in *Brummer*:

> Under this construction, all subsections of § 46-16-702, MCA, are given effect: *so far as the defendant is concerned, he may move for a new trial, and if he so moves, his motion must be in writing and filed within 30 days of the verdict or finding of guilty*; however, the right of the defendant to move for a new trial does not affect the court's inherent power to order a new trial *sua sponte* when required in the interest of justice.

*Brummer*, ¶ 46 (emphasis added).

¶42    The Legislature then expressly stated its intention to codify *Brummer* by amending the statute to clarify that trial courts "could order a new trial sua sponte."  1999 Mont. Laws 301.  It thus amended subsection (1) to clarify this singular point, and that provision now explains that a court can act on its own as well as pursuant to a motion by the defendant.  However, the Legislature expressed no intention and took no action to revise subsection (2), which remained applicable to new trial motions initiated by a defendant.  There was no need to do so—*Brummer* had explicitly explained that the

22

30-day provision of subsection (2) remained applicable to new trial motions filed by a defendant. There was no ambiguity on that point and the Legislature did not address it. Clearly, the Legislature did not, as the Court posits, "accept[] the equitable principles we enunciated in *Brummer*" in a manner that eliminated the 30-day requirement. Opinion, ¶ 24.

¶43 The Court repeatedly cites *Marker* for its equitable pronouncements and its holding that the District Court was not bound by a 30-day deadline. Opinion, ¶¶ 23, 25, 26. However, the Court offers misleading partial quotes from *Marker* and fails to explain that *Marker* dealt with a *sua sponte* granting of a new trial by the District Court. *Marker*, ¶ 7. The State's argument in *Marker* was that the 30-day deadline applied to the District Court's *sua sponte* action. *Marker*, ¶ 9. We disagreed and held, as stated in full quote:

> We reject the State's argument that the District Court is bound by the notice and time requirements contained in § 46-16-702(2), MCA. Subsection (2) requires that when a *defendant* files a motion for a new trial, the motion must be filed within 30 days following the verdict or finding of guilt. It has no bearing on how or when a court, *sua sponte*, may grant a new trial under subsection (1). We have held that the subsection (2) requirement that a defendant file a motion when seeking a new trial does not affect the court's inherent power to order a new trial *sua sponte* when required in the interests of justice. *State v. Brummer*, 1998 MT 11, ¶ 46, 287 Mont. 168, ¶ 46, 953 P.2d 250, ¶ 46. We now hold that the subsection (2) time and notice requirements pertaining to the filing of motions do not apply to a district court acting *sua sponte* under subsection (1).

*Marker*, ¶ 11 (emphasis in original). As did *Brummer*, *Marker* likewise reaffirmed the 30-day requirement for motions filed by a defendant, while holding that the requirement did not apply to new trials when ordered *sua sponte* by the court. Yet, the Court cherry picks language from *Marker* to give the false impression we held that courts could *always* act without regard to the time limitation in order "to remedy a palpable miscarriage of

23

justice." *Marker*, ¶ 13 (citations omitted). In my view, this is an incomplete, inaccurate, and misleading citation to *Marker*. The very precedent that the Court offers in Opinion, ¶ 25 as support for its decision—*Brummer* and *Marker*—both stand for the precisely opposite proposition: that the 30-day provision unquestionably applies to new trial motions filed by a defendant, which is the situation here.

¶44 The Court invokes § 1-2-101, MCA, for the principle that we are not to insert what has been omitted or omit what has been inserted. Opinion, ¶ 26. However, the Court is doing just that—it is omitting the 30-day provision by concluding that it has no effect. About subsection (1) of § 46-16-702, MCA, the Court offers that the Legislature "did not place any limitations on the court's authority to grant a new trial whenever required by the interests of justice." Opinion, ¶ 24. The fact that subsection (1) contains no provision that expressly prohibits a defendant from raising the issue is not surprising, seeing that this subsection addresses the authority of the court to act *sua sponte*. But, in any event, that does not somehow permit this Court to ignore and fail to enforce the expressly applicable provisions of subsection (2), which unmistakably governs Morse's motion for a new trial. Whatever canon of statutory construction the Court would choose to apply to this statute rebels against the Court's decision: the plain language requires filing of motions for new trial within 30 days; subsection (2) is specifically applicable over any general language in subsection (1); the subsections must be read together and reconciled to give effect to all; the intention of the Legislature is to be pursued. Any and all of these result in the 30-day requirement being applied to Morse's motion.

¶45 The purpose of subsection (1), as we have explained and the Legislature has confirmed, is to authorize a trial court to act *sua sponte* to order a new trial. That is for good reason—a court, having viewed the proceeding, may be convinced that the defendant received an unfair trial, and that the interests of justice require a new trial, such as in *Brummer* and *Marker*. Subsection (1) authorizes the court to act in that event. However, when a defendant files a motion, subsection (2) imposes time limits and other requirements governing that motion. There is no "tension" between provisions here. Opinion, ¶ 28. The only tension is in the Court's will to enforce them as enacted.[1]

¶46 I concur in the result reached here, but strongly dissent from the Court's manner of granting relief, which I believe to be an abolishment of a statutory requirement that is a clear violation of the constitutional separation of powers.

/S/ JIM RICE

---

[1] We should let our history guide us here. In *Gollehon*, we criticized ourselves for "start[ing] down this shaky staircase" of ignoring the 30-day requirement. *Gollehon*, 274 Mont. at 119, 906 P.2d at 699. We are now heading down this same path again, only this time we are brazenly tossing the statutory requirement altogether.