FILED

04/21/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 18-0046

DA 18-0046

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2020 MT 93N

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

DANNY LEE WARNER, JR.,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DC 16-542B
Honorable Robert B Allison, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

           Chad Wright, Appellate Defender, Koan Mercer, Assistant Appellate Defender, Helena, Montana

      For Appellee:

           Timothy C. Fox, Montana Attorney General, Tammy K Plubell, Assistant Attorney General, Helena, Montana

           Travis R. Ahner, Flathead County Attorney, Kalispell, Montana

           Submitted on Briefs:  November 13, 2019

                    Decided:  April 21, 2020

Filed:

                 _____
                        Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 On October 12, 2017, Warner, representing himself with standby counsel, was found guilty by a jury of robbery and use of a weapon during the commission of the robbery. The District Court designated Warner a persistent felony offender, imposed a 50-year sentence, and made Warner ineligible for parole for 35 years. Warner appeals; we affirm.

¶3 On November 23, 2016, around 9 p.m., Jordan Miller (Miller), an employee at the 406 Bar and Grill (406) in downtown Kalispell, took a work-break and walked to the Eagles Bar to buy Camel Blue cigarettes. As he was walking back to the 406, he passed a stranger, later identified as Warner, in the parking lot. The two nodded and said hello. Miller walked to the back entrance of 406, where his co-worker, Dustin McGibony (McGibony), was sitting on a retaining wall. Warner proceeded towards Miller and came within a few feet, enabling Miller to see his face under the light. Warner pulled out a handgun, held it to Miller's chest, and told him he wanted Miller's car keys. Miller responded he did not have car keys, but offered what he had in his pockets, including tip money of $120, the Camel Blue cigarettes, and a lighter. Warner did not believe Miller about the keys and told him not to lie because he was desperate.

2

¶4     Warner next moved to McGibony, who, thinking Miller and Warner were friends, was not paying attention to the encounter. Warner held the gun to the back of McGibony's head. Miller told McGibony to turn around. McGibony could see the shadow of the gun on the wall. McGibony turned to look at Warner, who was standing directly in front of him. McGibony, who did not know Warner, told Warner he had car keys, but that his vehicle was not in the lot. Warner repeated that he was desperate. McGibony replied, "I can see that you're desperate, you're holding a gun to my face." Warner briefly took McGibony's keys but gave them back and left. Miller and McGibony rushed inside 406 and told their manager, Brian Scotti-Belli (Scotti-Belli), to call 911 because they had just been robbed at gunpoint.

¶5     Scotti-Belli called 911 and relayed everything Miller described to him about the robbery and Warner. Miller's description included the robber wearing a dark-colored, bigger coat; a hat of some kind; and glasses. While Scotti-Belli was on the 911 call, Miller, McGibony, and Scotti-Belli saw through the window a man walk along the front of the 406 building, which had exterior lighting, towards the VFW bar. Miller informed Scotti-Belli, the man walking by was the robber.

¶6     Law enforcement arrived at the 406 and interviewed Miller, McGibony and Scotti-Belli. Miller described Warner to police as being close to his height of six feet, two inches and wearing glasses, a dark beanie, and a coat that was almost army green. McGibony told police Warner was wearing a big, green coat; perhaps a beanie; and small glasses. McGibony had difficulty estimating Warner's height because they had been

3

standing at different levels. McGibony described the gun as a Glock-style smaller handgun that he thought was black.

¶7    While law enforcement was investigating the robbery, Chuck Barlow, the manager of a rooming house near the scene of the robbery, observed an intruder on his security camera. Barlow called the police. When police responded, they told Barlow about the nearby robbery and provided a general description of the suspect. Barlow thought this fit the description of the intruder and printed off a small photo of the intruder from the security system.

¶8    Meanwhile, Miller and Scotti-Belli walked to the VFW thinking they might find Warner inside. Scotti-Belli also wanted to let the VFW staff know about the robbery. Miller walked through the bar but did not see Warner. However, after Miller stepped outside to make a phone call, Warner came out of the VFW and walked right by him. The two made eye contact, and Miller immediately called 911. Warner was no longer wearing the beanie but Miller immediately recognized his face.

¶9    After making the 911 call, Miller went inside to tell Scotti-Belli he had just seen the robber. The two men waited outside for the police. An officer returned to the VFW to show Miller the photograph Barlow provided. He explained to Miller where he had gotten the photograph and asked if the person in the photograph was the person who had robbed him. Miller responded yes.

¶10    Police arrived at the VFW and detained Warner who was sitting at the bar. Police searched Warner and seized cash in excess of $120, Camel Blue cigarettes, a lighter, and

a .9mm Springfield handgun. Miller identified Warner, the gun, the cigarettes, and the lighter.

¶11    McGibony did not view a photo lineup or participate in any other pretrial identification procedure of Warner. However, at trial, McGibony identified Warner as the robber. McGibony also identified the gun as similar to the gun used in the robbery. Apparently, prior to trial, McGibony at some point searched for Warner on the internet to ascertain whether he remained incarcerated and saw a picture of him.

¶12    On February 1, 2017, Warner moved the District Court to order a psychological examination pursuant to § 46-14-202, MCA. Warner filed another motion for a psychiatric examination on March 2, 2017. The District Court granted Warner's motion at a hearing held April 19, 2017. Noting § 46-14-202(4)(ii), MCA, requires the Defendant bear the cost of a psychiatric evaluation unless he is represented by the Office of the Public Defender (OPD), the District Court asked Warner whether he was able to bear the cost of appointing Dr. Phillip Rivers for an examination. Warner replied, "I don't have enough money, Your Honor." The District Court informed Warner, "[i]f you want that kind of evaluation we can send you to the State hospital, you would be there for several months and your trial would be bumped into October." Nick Aemisegger, a public defender, informed the District Court, "that's consistent with the policy of our office, that once a client waives representation we're no longer obligated nor do we have the authority to pay for any expenses at [Warner's] direction." Mr. Aemisegger indicated Dr. Rivers is an approved provider of mental health examinations for OPD. Regarding an independent examination by Dr. Rivers, the

5

District Court asked Mr. Aemisegger, "in a hypothetical case . . . what sort of time scale are we looking at?" Mr. Aemisegger replied: "usually a month to two months before he could conduct the evaluation, and then a couple weeks after that in order to get it." The District Court addressed Warner, stating "if your motion stands for a psychiatric examination I will grant it, but I will have you sent to the State Hospital at Warm Springs for that examination." Warner responded essentially characterizing the District Court's ruling as putting him in the position of either waiving an affirmative defense or agreeing to delay his case. Warner stated, "I'm willing to withdraw the motion, but with noted objection that I feel that I should be appointed an independent psychological examination." The District Court ultimately ordered Warner committed to Warm Springs for an evaluation.

¶13 A friend of Warner's, Caitlin Hamilton, testified at trial, that on November 23, 2016, Warner owned a vehicle. Hamilton testified that Warner had shown her the bill of sale, title, and registration for the vehicle. Hamilton testified that, following the arrest, she retrieved the vehicle from the parking lot of the VFW. Warner also called Dr. Bowen Smelko as an expert on eyewitness identification. Dr. Smelko testified extensively about memory processes and eyewitness identification.

¶14 On October 12, 2017, Warner, representing himself with standby counsel, was found guilty by a jury of robbery and using a handgun during the commission of the robbery. At the sentencing hearing, Warner stated he did not have any additions or corrections to the Presentence Investigation (PSI). Warner asked that his neuropsychological evaluation from an earlier federal charge in 2012 be attached to the

PSI. In response, the State asked that the more recent evaluation done by MSH also be attached to the PSI. Warner did not object to the State's request and the District Court agreed to attach both evaluations.

¶15 Warner first contends the District Court's "summary denial" of his speedy trial motions requires remand for further proceedings and an evidentiary hearing. On April 5, 2017, Warner filed a motion to dismiss for speedy trial violations, then renewed his speedy trial motion on September 29, 2017, just prior to his October 2017 trial. Warner's renewed motion intermingles arguments alleging ineffective assistance of counsel, discovery violations, oppressive incarceration, involuntary commitment, with alleged speedy trial violations–many of which were made in his first motion to dismiss.

¶16 We review a district court's speedy trial order to determine whether its findings of fact are clearly erroneous and we review a district court's conclusions of law de novo for correctness. *State v. Ariegwe*, 2007 MT 204, ¶ 119, 338 Mont. 442, 167 P.3d 815. The minimum delay necessary to trigger a speedy trial analysis is 200 days. *Ariegwe*, ¶ 41. The District Court found it "granted leave to file Information on November 25, 2017 and the trial was set for May 30, 2017, thus the gap in time between the trial date and the Information was 186 days." The record indicates, however, that Warner's trial date had been reset to October 10, 2017, which resulted in a delay of 321 days. The State concedes the length of delay as 321 days but maintains that under the facts of this case a hearing to consider speedy trial factors is unnecessary. We agree.

7

¶17 Although the District Court erroneously found the 200-day threshold had not been triggered, it made certain findings in its "Rationale" in support of its denial of Warner's motion to dismiss. Importantly, the District Court held:

> Upon the Defendant's inability to pay for a mental health evaluation in Flathead County, the Defendant was sent to the Montana State Hospital for evaluation following a pretrial hearing held April 19, 2017, and that was the reason his trial was delayed. Said evaluation was conducted at the request of Defendant and any delay that resulted should be attributable to him.

The record clearly demonstrates Warner, while representing himself, twice moved for a psychiatric examination and that the additional 135 days were directly attributable to Warner under *Ariegwe*. Undisputedly, the trial was delayed because Warner requested and received a mental health evaluation. While the District Court did not enter findings of fact and conclusions of law specifically addressing the *Ariegwe* factors, we are nonetheless able to assess Warner's speedy trial claim and conclude Warner's speedy trial right was not violated. Although the District Court erred in its calculation of days of delay and did not address all of the *Ariegwe* factors, "we will affirm the district court when it reaches the right result for the wrong reason." *State v. Betterman*, 2015 MT 39, ¶ 11, 378 Mont. 182, 342 P.3d 971. The District Court did not err in denying Warner's motion to dismiss for lack of speedy trial.

¶18 Warner's next claim is that the District Court erred in allowing McGibony's in-court identification. This Court treats a motion to exclude eyewitness identification as a motion to suppress and reviews the ruling to determine whether the district court's findings are clearly erroneous and the findings are correctly applied as a matter of law. *City of Billings v. Nolan*, 2016 MT 266, ¶ 15, 385 Mont. 190, 383 P.3d 219. We apply a

two-part test to determine whether evidence of an identification is admissible. *Nolan*, ¶ 19. We first determine whether the identification procedure was impermissibly suggestive. If it was, we then determine, based on the totality of the circumstances, whether the suggestive procedure created a substantial likelihood of irreparable misidentification. *State v. Lally*, 2008 MT 452, 348 Mont. 59, 199 P.3d 818.

¶19 Respecting the first prong, Warner asserts that in the absence of any pretrial identification process, McGibony's in-court identification of Warner amounted to an impermissibly suggestive "show-up" procedure under *Nolan.* A procedure is unnecessarily suggestive if a positive identification is likely to result from factors other than the witness's own recollection of the crime. *Nolan*, ¶ 20. Here, Warner was seated at counsel table and McGibony was asked, "can you identify in court the person who robbed you that night?" McGibony said yes and identified Warner. Warner is correct that, as in *Nolan*, the absence of a pretrial identification made McGibony's identification of Warner a "show-up" or "one-to-one" identification. However, other than being seated next to defense counsel, Warner cannot point to any other circumstance that would support his contention that the in-court identification was impermissibly suggestive. Here, there were sufficient factual circumstances to indicate the positive identification was likely the result of factors related to McGibony's recollection of the crime. McGibony had a face-to-face encounter with Warner when Warner pointed a gun at McGibony's head. Warner, while continuing to face McGibony, demanded McGibony's car keys. McGibony replied he had the keys, but his vehicle was not in the lot. Warner repeated that he was desperate and McGibony exclaimed: "I can see that you're

desperate, you're holding a gun to my face." Warner next took McGibony's keys. Given Warner's threats, his use of a gun, and his close proximity to McGibony, we conclude McGibony's in-court identification was a result of his recollection of the crime and not any unnecessarily suggestive procedure at trial.[1] Accordingly, as we find that McGibony's in-court identification was not impermissibly suggestive, we do not reach the second prong of the test—whether there was a substantial likelihood of irreparable misidentification. *Lally*, ¶ 15.

¶20 Warner next contends the District Court erred in refusing specific eyewitness identification instructions. Warner acknowledges this Court has held a trial court's refusal to give an eyewitness instruction similar to the one offered by Warner was not an abuse of discretion. *State v. Zlahn*, 2014 MT 224, ¶ 25, 376 Mont. 245, 332 P.3d 247. Warner urges us to overrule *Zlahn* stating, "the general witness instruction, focused on witness candor, does not adequately warn jurors of the risks of honest, but inaccurate identifications." This Court reviews a district court's decision that a requested jury instruction was not warranted for an abuse of discretion. *Peterson v. St. Paul Fire & Marine Ins. Co.*, 2010 MT 187, ¶ 45, 357 Mont. 293, 239 P.3d 904. A district court has broad discretion when it instructs a jury and reversible error occurs only where the instructions prejudicially affect the defendant's substantial rights. *Zlahn*, ¶ 14. There is no requirement that a jury be instructed specifically on eyewitness identifications in Montana. *Zlahn*, ¶ 23. Here, the jury instructions properly instructed the jury on

---

[1] McGibony's search of Warner on the internet prior to trial does not make his in-court identification of Warner impermissibly suggestive, particularly given that McGibony was examined by Warner during trial on this very issue.

witness credibility. As in *Zlahn*, the instructions given by the District Court "taken as a whole fully and fairly instructed the jury on the applicable law." *Zlahn*, ¶ 10. Further, Warner presented Dr. Smelko as an eyewitness identification expert. Dr. Smelko testified at length about inaccurate identifications and Warner emphasized Dr. Smelko's testimony during closing argument. We conclude the District Court did not abuse its discretion in denying Warner's proposed jury instruction.

¶21 Warner argues that the Montana State Hospital (MSH), psychiatric evaluation was a privileged communication and its disclosure by MSH, and use by the District Court at sentencing, was unauthorized. Warner contends a new sentencing is necessary before a different judge. We will not address whether dissemination of a defendant's mental health evaluation to the court and prosecution violated his constitutional rights where the defendant or his attorney did not object before or during trial. *See State v. Bartlett*, 282 Mont. 114, 127, 935 P.2d 1114, 1122 (1997). Here, Warner not only failed to contemporaneously object to the use of the evaluation conducted by MSH, but Warner raised the issue of his mental health as a mitigating factor at sentencing. Warner also requested a neuropsychological evaluation prepared in his 2012 federal criminal case be attached to the PSI and self-reported his mental health condition to the PSI author. We will not hold a district court in error for an action in which the appealing party acquiesced or participated. *State v. Gray*, 2004 MT 347, ¶ 20, 324 Mont. 334, 102 P.3d 1255. Warner failed to object and further acquiesced in the District Court's use of the MSH psychological evaluation. We therefore decline to address this issue.

¶22 Warner asserts he was entitled to an evidentiary hearing on his motion for new trial based upon his allegation that prosecutors listened to his privileged phone calls. This Court generally reviews a district court's decision to grant or deny a motion for new trial for an abuse of discretion. However, to the extent that a district court makes findings of fact while deciding a motion for new trial, those findings must be made by a preponderance of the evidence and will be reviewed for clear error. *State v. Morse*, 2015 MT 51, ¶ 18, 378 Mont. 249, 343 P.3d 1196. Specifically, Warner alleges he "obtained and presented documentation that before and during trial, prosecutors accessed and downloaded recordings of Mr. Warner's privileged strategy calls to his defense investigator." The State responds that, as an officer of the court, the prosecutor denied listening to the phone calls in question, reported that the nature of the recording system makes it impossible to listen to privileged phone calls, and offered a detailed explanation of how the recording system works.

¶23 In ruling on Warner's motion for new trial, the District Court held:

> [t]he State may have temporarily downloaded calls but could not have listened to them if they [were] made to an attorney or investigator. Searching Defendant's calls for non-confidential conversations does not constitute prosecutorial misconduct. The temporary download of calls to which the State could not listen did not deprive the Defendant of a fair and impartial trial.

¶24 We conclude the District Court's findings of fact are not clearly erroneous and were substantiated by the record established by both parties. The District Court did not abuse its discretion in denying Warner's motion for new trial.

12

¶25 Respecting the refusal by the District Court to allow a limited waiver of the attorney-client privilege, Warner unequivocally stated he would not waive his privilege and sought advice from the District Court about how to call his attorney as a witness without doing so. The record demonstrates Warner declared he had no intention of waiving his attorney-client privilege, stating "[n]o, your Honor, I'm not—I'm not willing to waive it." Further, Warner's attorney indicated: "I was told by this client, related to this subject, that under no circumstances was I to disclose information related to this." On this record, the District Court did not err in denying Warner's request for a limited waiver.

¶26 Warner argues that the District Court abused its discretion by refusing to send his audio exhibits to the jury room together with a method for playing them. In particular, Warner wanted the jury to hear the initial radio description of himself. However, the District Court properly refused Warner's request to send the audio descriptions of Warner to the jury room because to do so would risk emphasizing the audio information over other testimony. For the first time on appeal, Warner argues the prosecutor committed misconduct during his closing argument by commenting on his silence when he was arrested and by exceeding on rebuttal the scope of issues Warner addressed in his closing. Warner suggests that the Court can address this claim through plain error review, though he does not cite the standard for plain error or do any analysis of plain error. "[A] mere assertion that constitutional rights are implicated or that failure to review the claimed error may result in a manifest miscarriage of justice is insufficient to implicate the plain error doctrine." *State v. Gunderson*, 2010 MT 166, ¶ 100, 357 Mont. 142, 237 P.3d 74.

13

Here, due to lack of analysis, plain error review is inappropriate. Having found that there was no error committed during Warner's trial, we decline to address Warner's argument that there was cumulative error.

¶27 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. This appeal presents no constitutional issues, no issues of first impression, and does not establish new precedent or modify existing precedent.

¶28 Affirmed.

/S/ LAURIE McKINNON

We concur:

/S/ DIRK M. SANDEFUR
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON